Petition of MOORE–McCORMACK LINES, INC., as owner of THE Steamship MORMACKITE, for exoneration from or limitation of liability.

MOORE–McCORMACK LINES, INC.,
Cross-Libellant,

v.

Claire S. McMAHON, as executrix under the last will and testament of Patrick McMahon, deceased, Respondent.

MOORE–McCORMACK LINES, INC.,
Cross-Libellant,

v.

Luisa V. WALL, as administratrix of the goods, etc., of Edward T. Wall, deceased, Respondent.

MOORE–McCORMACK LINES, INC.,
Cross-Libellant,

v.

Jean O. RICHARDSON, as executrix under the last will and testament of Harold R. Richardson, deceased, Respondent.

United States District Court
S. D. New York.
June 30, 1958.

Burlingham, Hupper & Kennedy, New York City, for petitioner and cross-libellant. Eugene Underwood, Robert A. Feltner, Richard C. Hatch, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for claimants Armco Steel Corp., and Wessel, Duval & Co. Henry N. Longley, John J. Martin, New York City, of counsel.

Bernard Rolnick, Robert H. Kilroe, Milton H. Spiero, New York City, for claimants Charles L. Williams, Tadeo Del Valle, Miguel Hernandez, Charles Henry, Shed Sullivan, Jr., Pedro De Jesus, Remy Rosario and Maria De Oliviera Lavor.

William L. Standard, New York City, for claimant Ana Pagan. Herman Rosenfeld, New York City, of counsel.

Lee Pressman, New York City, for claimants Lillie Robinson, Mary G. Banks and Mae Berk. Herman Rosenfeld, New York City, of counsel.

Shafter & Shafter, New York City, for claimants Estelle Waithe and Luz Pena. Alfred M. Shafter, New York City, of counsel.

George Mutterperl, New York City, for claimant Genovena Rodriquez.

Diamond & Elkind, New York City, for claimant Cassie Braithwaite. Alfred M. Shafter, New York City, of counsel.

Cooper, Ostrin & De Varco, New York City, for claimants John A. Davis, Thomas Leamy, Manuel Roman, Helen Clark, Emilia Branca, Fred Tatter and Sarah Jiminez. Herbert J. De Varco, Richard Gyory, New York City, of counsel.

George Engelman, New York City, for claimant Teresa Morin. O. Raymond Basile, New York City, of counsel.

William Kapelman, New York City, for claimant Bernard Knieger.

Joseph Friedberg, Robert Kilroe, New York City, for claimants Milagros R. Acosta, Mercedes Cadiz, Delores Velez, Eulogia Cadiz, Ralph Pagen and Marianna Acosta.

Sol C. Berenholtz, Baltimore, Md., for claimants Sarah L. Frost, Nanine W. Gibbs, Catherine J. Gibbs and Mary Lord. Cooper, Ostrin & De Varco, New York City, of counsel.

Irving G. Gordon, New York City, for claimant Lillian Lewis.

Herbert J. Kaplow, New York City, for claimant Daniel Watts.

Boudin, Cohn & Glickstein, New York City, for claimant Eldredge T. Lemell.

Zock & Petrie, New York City, for claimant National Cinema Service.

Nathan Greenberg, New York City, for claimants Margaret Svendsen and William Grealish. Herbert J. De Varco, New York City, of counsel.

Hill, Betts & Nash, New York City, for claimants Lucy C. Mayes, Caroline Barclay, George Hinton, Josephine Overton and Nathan H. Dickerson.

Paul C. Matthews, New York City, for respondent Claire S. McMahon. Edwin M. Bourke, John J. Robinson, New York City, of counsel.

Trapp & Hohmann, Huntington, N. Y., for respondents Jean O. Richardson and Luisa Virginia Wall, by Bigham, Englar, Jones & Houston, Henry N. Longley, John J. Martin, New York City, of counsel.

McGOHEY, District Judge.

■ Moore-McCormack Lines, Inc. petitioned for exoneration from or limitation of liability for the sinking and total

loss of its vessel S.S. Mormackite and her cargo off Cape Hatteras at about 9:45 in the morniing on October 7, 1954. Thirty-seven of her personnel, including all her officers, perished. Eleven survived.

Claims were filed by the cargo owners, the survivors and the personal representatives of the estates of the deceased. The petitioner filed cross-libels asserting counterclaims against the representatives of the estates of the master, the chief officer and the chief engineer.[1] The claims by and against the representative of the master's estate were settled during trial.

The court's findings and conclusions are set forth in the following opinion.

The petition is in all respects denied and the cross-libels against the representatives of the estates of the chief officer and the chief engineer are dismissed.

All claimants are entitled to recover their damages and costs. The question whether interest may or should be awarded on any of the claims is reserved. As to the death claims and those of the survivors, it will be decided when those damages are determined. As to the cargo claimants, it will be decided on the coming in of the Special Commissioner's report or, if the parties stipulate those damages, on the entry of the final decree.

Petitioner is now and was at all relevant times a Delaware corporation having its principal place of business at 5 Broadway, New York, New York.

The S. S. Mormackite was owned by the petitioner when she sank, and her home port was New York, New York.

The vessel departed Vitoria, Brazil, September 25, 1954, bound for Baltimore with a cargo of 9,003 tons of iron ore and 30 tons of bagged cocoa beans.

She sank off Cape Hatteras at about 9:45 in the morning of October 7, 1954.

She was equipped with adequate lifeboats and was seaworthy as to hull, gear and safety equipment when she sailed from Vitoria.

The vessel, cargo, personal effects and baggage of her officers and crew were a total loss.

All of the deceased for whose deaths claims have been filed in this proceeding were employed on the vessel by the petitioner. They lost their lives at the time of the sinking or within a few hours thereafter.

All of the survivors who have filed claims were employed on the vessel by the petitioner. They were taken from the water some time during the morning of October 9, about fifty hours after the sinking.

The iron ore was owned by the claimant Armco Steel Corporation. The cocoa beans were owned by the claimant Wessel, Duval & Co., Inc.

At all relevant times the cargo owners were, respectively, corporations of Ohio and New York.

The ore was carried under a Charter dated September 3, 1954, executed by a duly authorized representative of Armco Steel Corporation and a vice president of the petitioner.

The cocoa beans were carried under a bill of lading in conventional form.

The petition alleges:

"Second: * * * Petitioner used due diligence to make the MORMACKITE seaworthy and at the time of the loss hereinafter set forth, and at and prior to the commencement of the voyage upon which said loss occurred, she was tight, staunch, strong, fully manned, equipped and supplied, and in all respects seaworthy and fit for the service in which she was engaged.

"Third: On September 25, 1954, the MORMACKITE sailed on a voyage from Vitoria, Brazil, to Baltimore, Maryland, laden with a cargo

---

1. See Moore-McCormack Lines v. McMahon, 2 Cir., 235 F.2d 142.

of iron ore and cocoa beans. She was in command of a competent and experienced master and was fully manned by a crew of competent and experienced licensed officers and unlicensed personnel. She proceeded on the aforesaid voyage without untoward incident until, on the early morning of October 7, 1954, she encountered strong winds and rough seas with long and heavy ground swells. The force of the wind, seas and swells caused her to roll and pitch and as time passed the wind, seas and swells increased in violence and caused her to roll and pitch, more and more. Speed was reduced and the course was changed to minimize the effect on the vessel but the storm did not abate and early in the 8:00 a. m. to 12 noon watch the vessel took a definite list to port. Measures to prevent a further list and to cause the vessel to return to an even keel were immediately taken and the list was arrested. The wind, seas and swells continued to bear upon the vessel with unabated force and after an interval estimated at about half an hour after the first list was taken and arrested the vessel took an additional list. The work of attempting to right the vessel continued without pause and the master ordered the radio operator to send a wireless message to inform vessels and shore stations of the danger but before further action could be taken to overcome the force and violence of the wind, waves and swells the vessel rolled over on her beam ends. The entire crew had been aroused and alerted and at the master's order from the navigating bridge took to the water. In a short time the vessel sank at a point about eighty miles E by N from Cape Hatteras. Each man was provided with an approved life preserver in good condition and the radio operator had a portable lifeboat-type wireless transmitter and receiver with which he attempted to send additional distress messages. The men in the water gathered hatch boards, dunnage boards and other objects made of wood which broke free from the vessel after she sank and improvised rafts which were used in addition to the life preservers to sustain them in the water. On the early morning of October 9, 1954, before dawn, the steamship MAKEDONIA, which had been informed by wireless of the possible fate of the MORMACKITE and alerted to watch for survivors, heard voices of men in the water. She immediately launched a boat and attempted to find them but not being equipped with a searchlight could not find anyone until dawn. Immediately upon hearing the voices in the water she notified the United States Coast Guard by wireless of her position and several Coast Guard vessels which were searching a wide area for the vessel or her survivors, and other vessels, privately-owned, began to converge on the scene at full speed. The MAKEDONIA picked up a total of eight survivors and three other survivors were picked up by other vessels. All were transferred to two United States Navy destroyer escort vessels which had been proceeding in the vicinity and were taken at high speed to Norfolk, Virginia, where they were immediately transferred to the United States Public Health Service Hospital. * * *

"Fourth: The aforesaid loss of life and the loss of the MORMACKITE and her cargo by reason of the premises were not caused or contributed to by any fault, neglect, design or want of care on the part of petitioner, the MORMACKITE or those in charge of her or of anyone for whom petitioner may be responsible, but were due to act of God and/or perils of the sea and navigation and/or latent defects not discoverable by the exercise of due diligence and/or to errors of judg-

ment in navigation or management of the vessel.

"Fifth: The aforesaid sinking on October 7, 1954, and the loss of life, damage and destruction resulting therefrom or consequent thereupon, were occasioned and incurred without the privity or knowledge of petitioner or of the master of the MOBMACKITE [sic] or of the superintendent or managing agent of petitioner or of any of them at or prior to the commencement of the voyage upon which the MORMAC-KITE was then engaged."

About a year after filing the petition, the cross-libels were filed. These allege, in substance, that the loss resulted from the failure and neglect of the master, chief officer and chief engineer, in violation of their respective employment contracts, properly and efficiently to perform their duties with respect to the stowage, management and navigation of the vessel. They seek indemnity for her loss and such sums as the petitioner may be required to pay on the claims arising therefrom.

It is not disputed that the wind was strong and the seas heavy when the disaster occurred; that some time during the morning the ore shifted and the vessel listed to port and eventually capsized and sank.

There was dispute as to the severity of the wind and seas on the morning of the loss; whether in the conditions existing on that morning the Mormackite was properly navigated and managed by the master, chief officer and chief engineer; whether she had adequate stability when she sailed on the fatal voyage; whether, if she did not, this resulted from the petitioner's failure to furnish her officers with sufficient accurate data and equipment to determine her actual stability; whether the ore was properly stowed; whether, if it was not, this was due to her master's neglect and with privity and knowledge of her owner.

The vessel's logs were lost. Accordingly, her officers' personally recorded observations of the weather encountered on the day of the sinking are not available. However, the survivors and the two experienced weather experts who testified were in substantial agreement as to what the weather was on that day. The vessel had encountered only fine weather from September 25, the day she sailed, until early in the morning of October 7. The wind had begun to freshen around midnight. Although the wind and waves increased thereafter, she encountered no unusually heavy seas and she rolled only moderately until shortly before 4 A.M. From then on, the force of the wind and the height of the waves increased but at no time was the wind much greater than force 8 on the Beaufort scale, that is, a fresh gale averaging 37 miles per hour. The significant height of the waves was about 20 to 22 feet. The period of the waves was about 7 seconds. In the afternoon the weather moderated considerably.

The Mormackite sustained no structual damage prior to the sinking. The weather on the fatal morning, though rough, was no worse than is common off Hatteras during October and so, was to be expected on this voyage. A stable seaworthy vessel, properly navigated and managed, should have been able to survive in it. Others in the vicinity at the time did. The loss did not result from a peril of the sea.[2]

There was, understandably, some variation in the survivors' recollections of the details and sequence of significant events on the morning of the sinking. However, the sum of their testimony presents a fairly clear account of what happened. I find it was as follows. Shortly after 4 A.M., heavy seas struck the vessel's starboard side, rolling her very hard to port about 20 to 25 degrees. The ore shifted.

2. See The Vestris, D.C., 60 F.2d 273, at page 278; The T. J. Hooper, 2 Cir., 60 F.2d 737, at page 738.

This was heard by some survivors. The vessel took a port list. Her speed was reduced at once. Hernandez, the chief steward, was thrown from his bunk by the roll. Henry, a room steward, was awakened and shifted his pillow to the opposite end of his bunk in order to accommodate himself to the list. He remained in his bunk. Hernandez dressed and proceeded to inspect the officers' and crew's mess rooms and the galley, for breakage. His room was on the main deck. He first went to the deck immediately above and checked the officers' mess and pantry. He then went up to the next deck to the captain's quarters. Both the master and chief officer were already out of their rooms. Normally they would not be up at that hour. Hernandez then went down to the main deck to check the conditions in the crew's mess and the galley. While making his inspections there he "noticed the ship was having that same list that they had when [he] woke up." The list, however, was being corrected. By the time his inspections were finished the vessel had only "a little list" and, although not entirely sure, he thought she even may have been "all straight up." Other survivors said she still listed to port to some extent when they went to breakfast at 8 o'clock. I find she did; and that, after 4 A.M. she rolled more to port than to starboard. The crew nevertheless went about their regular duties as usual.

During breakfast the rolling became more severe. Heavier seas were still coming from starboard. Some time after 8:30, there was another very violent roll to port. The ore shifted heavily again. This also was heard by some survivors. It made a noise like coal being dumped on the deck. The shifting continued. The vessel took a severe port list. When this occurred most of the crew got their life jackets and congregated at the starboard rail on the main deck aft. The list increased steadily. Chief Officer Richardson and Chief Engineer Wall were then seen attaching fire hoses to the sounding pipes leading to the starboard deep tanks.

Just before the vessel went all the way over on her port side, the men at the stern walked forward on her starboard side to about amidships and then down into the water. As far as is known, all personnel, except Captain McMahon and two unidentified men, got off. These three were last seen on the bridge just before the others went into the water. They were not seen thereafter. About 50 hours after the sinking the survivors were rescued as described in paragraph "Third" of the petition set forth above.

At or shortly after 8:30, speed had been increased. Roman, a wiper, was in the engine room at the time. His sea experience totaled about 13 months. He did not testify in person. The petitioner read from his deposition taken on April 26, 1955. When the ship rolled violently, tools in the engine room were thrown to the deck, causing a great noise. Roman left. He went up to his room, got his life jacket and joined the men on the main deck aft. At or about the time the violent roll occurred, he observed the speed indicator and it then registered "full speed." However, "the next telegraph order from the bridge" was "full stop; then they put it—every moment it was changing."

Lemell, second electrician, was checking electric lights on the bridge at about this time. Just before the violent roll which he called a "jar," he noticed an increase in speed and he heard the chief officer, Richardson, tell the junior mate he would show him "how to drive her through the bad weather."

The petitioner contends the conditions existing at 8:30 not only did not justify an increase in speed, but, on the contrary, required that this be avoided; that Chief Officer Richardson was grossly negligent in ordering increased speed; that this and other acts of negligence to be later discussed, proximately caused the loss of the vessel and cargo and death and injury to her officers and crew.

It must first be noted that there is no testimony whatever that Richardson ordered the increase in speed. He was,

it is true, on the bridge at the time. But that alone does not support an inference that he ordered the increase in speed. Captain McMahon also was up and about, as he had been since 4 o'clock. There is no reason to suppose he was not using his own judgment in the crisis and exercising his full authority as master to carry it out. Indeed the testimony of survivors shows he was. He was seen on the bridge. He was heard ordering "right wheel amidship—he was trying to right the ship." I find that he was in full command; and that it was he who ordered increased speed.

It was not disputed and I find that, serious danger can result from the synchronization of a vessel's period of roll with the period of waves; that such danger can be avoided and the amplitude and violence of the vessel's rolling reduced, by changing course or reducing speed, or both; that it is customary to take these precautions in heavy seas, in which synchronization is always possible if not guarded against.

It was certainly not established here, however, that sound navigation inevitably forbids increasing speed in conditions such as confronted the Mormackite's master at 8:30. While the experts agreed that increased speed could have caused the violent movement to port and the resulting cargo shift, at 8:30, none said the emergency Captain McMahon faced at that time did not justify the risk which an increase in speed involved; or that such a risk is never justified in any circumstances. At 8:30 the vessel still had a port list which resulted from the first shift of cargo at 4 o'clock. And, despite the fact that she had been on reduced speed since shortly after 4 o'clock she was nevertheless rolling hard. And the seas hitting her starboard were heavier than before. It is obvious that, in order to avoid a further shift of the ore, a change of course was necessary. It is clear this is just what Captain McMahon was trying to do. Indeed the probability is, he was trying to put her

about so that she would take the seas on her port side and thus cause some of the ore to shift away from port to starboard. This is a maneuver which Captain Barrett, the petitioner's assistant marine superintendent, said was appropriate in such circumstances; and the very one he executed successfully in a similar situation when, on a voyage up the Maine coast, he ran into a blizzard. He like Captain McMahon, was carrying bulk cargo. Captain Barrett's was sulphur. His vessel "took a couple of heavy rolls and laid over about 15 degrees." This "threw" the sulphur from the 'tween-deck down to the opposite side in the lower hold. There was no time to hand trim the cargo. He brought his vessel about and worked her offshore where the heavy seas would hit the side to which she had listed. This caused some cargo to shift in the opposite direction. His vessel thereupon straightened up and he brought her safely through the storm and completed his voyage. He obviously had to put some speed on her to execute this maneuver. How much, he did not say.

The precise amount of speed appropriate to maneuver the Mormackite into better position at the time, surely cannot be reliably determined after the event by men not confronted by all the conditions her master actually faced. Significantly, neither Captain Barrett nor any of the other experts was asked to attempt such a determination. Here, obviously, the master had to use his experienced judgment in an emergency. Captain Barrett said that, in an emergency, "[he] would not hesitate to do anything for the good of the vessel"; he would not hesitate indeed to put her "two or three feet" below her marks by ballasting "if [he] had to to straighten the ship up."

The evidence does not support the inference that Captain McMahon did not use the best judgment which a man of his conceded experience and competence would be expected to exercise in such an emergency. When the first shift of cargo

occurred at 4 o'clock, speed was reduced at once and steps were immediately begun to correct the list. These, as has been found, proved only partly successful. By 8:30 it was obvious that something more was needed. Captain McMahon had risen rapidly in the petitioner's employ. His superiors, Captain Furey, the petitioner's Chief of Operations, and Captain Mayo, its Marine Superintendent, testified they regarded him highly. His prospects of further advancement were very bright. It is inconceivable that such a man, having taken the proper steps when the first list occurred at 4 o'clock would later, with that list only partly corrected, and the seas more severe, needlessly and recklessly risk his future career, his vessel and indeed his own life and others' by increasing speed if this were inexorably forbidden; or if, in his experienced judgment, it offered no reasonable prospect of success but, as the petitioner argues, was sure to make worse an already serious situation. I find Captain McMahon was not negligent in ordering such speed changes as he did, because, as I find from Captain Barrett's testimony, the risk which this entailed was balanced by a reasonable probability of saving the vessel. It was, therefore, justified by the emergency Captain McMahon had to meet.

Failure to ballast properly and in time is also charged by the petitioner. There is, however, no evidence that the powerful cargo pumps were not put into operation after the vessel took the second list at 8:30. Nor is there any rational basis for assuming that the concededly experienced and competent master and other officers disregarded this obviously speedy and normal method of ballasting in favor of the slower method of pouring "piddling" streams from fire hoses down the sounding pipes. The only rational inference from this record is that these competent men did get the pumps started. Their use of the fire hoses shows they seized on every means available to speed ballasting and save their vessel. The list caused by the shift of cargo at 4 o'clock had been substantially overcome shortly after it occurred. Hand trimming was not then resorted to and there is no evidence that the hose lines were then employed. Accordingly the correction must have been accomplished by use of the powerful cargo pumps. There is no basis whatever for supposing the officers were less alert and efficient after the second and more severe 8:30 list, when their personal danger was so much greater than it had been earlier. I find they were not; and that, the cargo pumps were put into operation after the 8:30 list.

There was no direct testimony that no radio message was sent, but that seems the only inference to be drawn from facts which are not in dispute. There were vessels near enough to have arrived at the scene of the sinking within a few hours if they had received a message. None arrived. There was no testimony that any received a message. It is inconceivable that all or indeed any of them would have ignored a message. I find none was sent. This, however, did not cause or contribute in any way to the capsizing and sinking. The petitioner does not contend otherwise. Its contention that this did contribute to the loss of life will be considered later.

The cargo in a well-stowed vessel does not, ordinarily, shift seriously the first time she encounters moderately rough seas, as the Mormackite's did at 4 A.M. on the 7th. There is neither claim nor proof of any fault in her navigation prior to that time. In light of the facts already found, it is at least a permissible if not indeed a compelled inference that the Mormackite's cargo was not properly stowed and that she was, for that reason, unseaworthy when she sailed. The petitioner strongly urges that no such inference is permissible here because the shift of cargo occurred "late in the voyage"; after the vessel had been eleven days at sea and was but one day from Baltimore, her destination. I, however,

do not, as the petitioner does, read the decisions in Commercial Molasses Corp. v. New York Tank Barge Corp.[3] and cases therein cited, as holding that mere passage of time, inevitably, forbids the inference. Rationally, the fact that the Mormackite's ore did not shift during eleven days of sailing in calm seas, is irrelevant to the issue whether her stowage was fit to withstand the rigorous rolling she was certain to experience in the weather to be expected off Hatteras in October. As the findings show, the ore shifted seriously on her first encounter with weather much less severe than she had to expect and be able to withstand. The inference is inescapable, I think, that she was unseaworthy as to her stowage. And as the subsequent findings show, she probably lacked adequate stability as well. On the whole evidence, I find she was unseaworthy when she sailed on her fatal voyage. For an adequate understanding of her stability characteristics and her stowage on the fatal voyage, it is necessary to consider the vessel's history and the data and equipment furnished to her master for use in planning her stowage.

The Mormackite's construction was completed in May, 1945 by Moore Drydock Company of Oakland, California. The latter is not related to the petitioner. She was one of 84 steel vessels of the type known as C2–S–B1 built by Moore Drydock Company for the United States in accordance with plans and specifications prepared by the United States Maritime Commission. This type vessel was designed to carry general, bulk and liquid cargo.

She was owned by the United States and known as the S.S. Wild Rover from May, 1945 until she was purchased by the petitioner in February, 1947, and renamed S.S. Mormackite. She was operated by the petitioner at all times prior to her purchase; first as agent for the United States, later as bareboat charterer.

She was equipped with a General Electric turbine with double reduction drive and two Babcock & Wilcox boilers.

Her registered dimensions were: gross tons 6,195.61; net tons 3,589; length 438.9 feet; breadth 63.1 feet; depth 27.75 feet.

She had five cargo holds, each having upper and lower 'tweendeck compartments and a lower hold. Her machinery space was between the Nos. 3 and 4 cargo holds. She had double bottom tanks below her machinery space and lower holds. Fresh water tanks occupied the after end of No. 3 lower hold. Deep tanks occupied all of Nos. 2, 4 and 5 lower holds. Those in No. 5 lower hold were only a little more than half as high as the other deep tanks. The lower 'tweendeck in No. 5 was correspondingly deeper in the vessel than the lower 'tweendecks in the other cargo holds. It was not, however, as low as the lower holds.

The C2–S–B1 design was adopted by the Maritime Commission some years prior to World War II. When war broke out it became necessary to install guns and other armament on the top decks of vessels being built to this design.

The specifications issued by the Maritime Commission to Moore Drydock Company contained the following provision:

"When the ship is substantially complete, the vessel is to be inclined under the supervision of the Bureau of Marine Inspection and Navigation and in the presence of a representative of the Maritime Commission. The contractor shall prepare and submit to the Maritime Commission the report of inclining experiment establishing the vessel's light ship weight and center of gravity together with calculations of trim and stability covering all reasonable operating conditions of loading. Only one vessel of this design at each yard need be inclined, pro-

---

3.  2 Cir., 114 F.2d 248, affirmed 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89.

viding no changes which have involved increased weight have been placed on board."

The first vessel of the C2–S–B1 class constructed by Moore Drydock Company was the S.S. Hotspur. She was subjected to an inclining test under the direction of Mr. Hischer, the builder's naval architect, in the presence of the Commission's representative on December 27, 1942. At that time her armament items had not yet been installed. Accordingly, allowance was made for the installation on her upper decks of items of varying weights. The test showed that, with these additions but without compensating ballast in her holds, fully loaded and ready for sea, that is, with cargo, crew, stores, fuel, etc., the Hotspur would be unstable. The Maritime Commission thereupon directed Moore Drydock Company to install 600 tons of concrete ballast in No. 3 lower hold of the Hotspur and each of the other C2–S–B1 vessels it was to build.

The kinds and weights of the armament items were not uniform on each of the C2–S–B1 vessels built by Moore Drydock Company. Accordingly, the amount of ballast varied in the several vessels. One of these was the S.S. Dashing Wave. Another was the S.S. Wild Rover—later renamed the Mormackite. The Dashing Wave's ballast amounted to 610 tons. The Wild Rover's amounted to 585.2 tons. Neither of these two vessels was actually inclined by the builder. They were tested for stability by the method about to be described. Hischer, whose testimony I accept, swore, without contradiction, that this method was in accord with the common practice of shipbuilders. It is as follows. When more than one vessel of a class is being constructed by the same builder, only one of them is actually inclined. The finding as to stability based upon the data thus obtained is taken as applicable to all others in that class built by him, in which the weight is not changed. If in any other vessel of the class he makes changes which involve increases in weight, that vessel is tested for stability, without actually inclining her. Her stability is determined by recalculating the data obtained from the inclining test of the first vessel after interpolating therein the estimated effect of the weight changes in the subsequent vessel. The finding as to stability resulting from this recalculation is then taken as applicable to every vessel of the class in which the same or substantially similar changes are made by the builder.

Literal compliance with the quoted specification would seem to have required that at least the Dashing Wave be inclined to ascertain what effect the added weights had on her stability. The Commission, however, apparently considered Hischer's procedure sufficient. It approved and accepted not only his finding that the Dashing Wave was stable, but his method as well. Moreover that finding was accepted without further recalculation, as applicable to the Wild Rover (Mormackite) and to the other vessels of the C2–S–B1 class in which there were installed armament items and ballast whose weights and locations, though not precisely the same as those in the Dashing Wave, were, within permissible range, substantially so.

The recalculations respecting the Dashing Wave, showed the following. With armament and ballast, her light ship weight was 5,261 tons; her KG (vertical center of gravity) was 25.71 ft.; her GM (metacentric height) 7.19 ft. With an assumed capacity load of 6400 tons of cargo having a density of 84.87 cu. ft. per ton, and ready for sea at a mean draft of 25.80 ft., her weight was 13,861 tons; her KG was 22.90 ft.; her GM, before correction for free surface of liquids in her tanks, was 2.45 ft. With a correction of 1.13 ft. as directed by the Maritime Commission, her GM was 1.32 ft. This correction was based on an assumed free surface in more of her double bottom tanks than would be likely to exist under ordinary operating conditions,

According to the petitioner's expert, Wilson, the standard free surface correction used in inclining experiments is .85 ft. The use of this correction for the Dashing Wave would have shown her GM as 1.60 ft.

GM is the commonly accepted measure of a vessel's stability.

The petitioner's Chief of Operations, Captain Furey, advised its masters in a bulletin designated "OV–46–50," dated March 1, 1950, that "the generally accepted metacentric height considered suitable for freight vessels" is "5% of the beam width." The OV (Operation-Vessels) bulletins were customarily filed on each vessel. The beam width of the C2–S–B1 vessels built by Moore Drydock Company was 63.1 ft. Thus, according to the petitoner's standard, the suitable GM for the Dashing Wave when fully loaded and ready for sea was 3.15 ft.

Moore Drydock Company made no cross-curves of stability of any of the C2–S–B1 vessels it constructed. The Commission's specifications did not require the builder to make them.

Moore Drydock Company did not prepare a stability booklet for any of the C2–S–B1's it constructed for the Maritime Commission. The Commission, however, did; and one was furnished to each vessel, including the Mormackite. There is no reason to suppose hers was not on board when she loaded the cargo for her final voyage. I find it was.

A C2–S–B1 vessel built as originally designed, without permanent ballast and armaments, is stable in her light ship condition.

The petitioner's Captain Moon took possession of the Wild Rover in May 1945. He then received from the builder the following plans relating to her stability: ballast plan, capacity plan, hydrostatic curves, flooding curves and bonjean curves. The capacity plan showed she had 585.2 tons of concrete ballast in her No. 3 lower hold. There is no reason to suppose these plans were not on the Mormackite when she sailed on her final voyage. I find they were.

In December, 1945, some guns and other armament items were removed from the vessel. It was not until after the petitioner took title in February, 1947, that the last of these were removed. A mine detection device was never removed. The petitioner produced several contracts covering removal of the armament items. None of these contracts provided for removal of the concrete ballast.

Captain Barrett, the petitioner's Assistant Marine Superintendent, was in immediate charge of all matters relating to the stability of the petitioner's vessels. His immediate superior was the Marine Superintendent, Captain Mayo. Captain Furey, Chief of the petitioner's Operations Department since 1939, was the superior of both Captain Mayo and Captain Barrett. The latter two officials were called by the petitioner at the trial. Captain Furey was not. A doctor's certificate stated he was too ill to appear. The petitioner introduced his testimony through his deposition taken in December, 1956.

According to Captain Barrett, the Mormackite's concrete ballast was removed, although not at one time but at various unspecified times between voyages during the period which began at the end of 1945 and continued until some unspecified time after the petitioner took title to the vessel in February, 1947. He thought as much as 30 or 40 tons might have remained in her No. 3 lower hold when the petitioner became her owner in February, 1947. How he computed this amount was not disclosed. No contracts, work orders or bills were produced for the work of removing any part of the ballast. There was no evidence as to precisely when or by whom any part of it was removed. Captain Mayo said the Stevedoring Department, a division of the Operation Department, arranged to

have it done on orders from Captain Furey. The latter, however, when asked during his deposition if he knew "whether there have been any structural changes" made in the vessel after her purchase, said "I have not been concerned with any although I understand there have been some." He also said he had never seen any plans or specifications for any structural changes in the vessel; and was not generally familiar with her "history" subsequent to her purchase by the petitioner.

In addition to the foregoing, other changes were made in June, 1948, under contracts which were produced. These changes introduced additional weight high in the vessel. They consisted of the addition of a new bridge deck housing, new staterooms and other facilities; also the installation of port and starboard sheer strake steel doubler plates.

The Mormackite's capacity plan shows that, as built, her light ship weight was 5,328 tons; i. e., 67 tons greater than the corresponding weight of the Dashing Wave. By a method, the validity of which was not challenged, the petitioner's expert, Mr. Wilson, estimated the total weight of all items added to the Mormackite in 1948 to be 41 tons. 122.8 tons was the known weight of all armament items removed. The concrete ballast amounted to 585.2 tons. Assuming all of this was in fact removed, the various changes resulted in a net deduction of 667 tons from her light ship weight as built, and made her light ship weight in June, 1948, 4,661 tons, and her KG 27.90 ft.

Changes similiar to those made on the Mormackite were made on all C2–S–B1 vessels owned by the petitioner.

There was no evidence that any further changes affecting the Mormackite's weight were made after June, 1948.

In July, 1948 the American Bureau of Shipping approved the petitioner's application for a new load line for the Mormackite and issued a certificate for a freeboard of 3 ft. 7¼ in.; a moulded draft of 27 ft. 7¼ in.; an extreme draft of 27 ft. 8 in. This certificate was in effect on September 25, 1954 when she sailed on her final voyage. At that time her draft was 27 ft. 6 in. fore and aft. She was not loaded below her marks when she sailed.

It is necessary when cargo is to be stowed on a vessel that its distribution be carefully planned so as to insure that the vessel will have adequate stability for her intended voyage. Determination of a loaded vessel's stability involves what the petitioner's Chief of Operations, Captain Furey, called "a very, very complicated mathematical calculation which the stabilogauge is designed to do away with." A stabilogauge is a computing machine on which there can be registered mechanically the weight of cargo proposed to be stowed in each of the vessel's compartments, the necessary corrections for the cargo's density and for free surface of liquids in her tanks. As these data are registered, the stabilogauge makes the necessary calculations mechanically and, on a scale designed to do so, shows the vessel's GM.

The starting point of such a calculation, whether it be worked out mechanically or otherwise, is, of course, the vessel's actual light ship weight and center of gravity or KG. Therefore, a stabilogauge customarily is calibrated by the manufacturer initially so as to register as the starting data of any loading problem, the correct light ship weight and KG of the particular type of vessel on which it is to be used.

There was a stabilogauge on the Mormackite. There was, however, no testimony as to the light ship weight and KG to which it was in fact calibrated when the vessel loaded at Vitoria on September 24, 1954. Captains Furey, Mayo and Barrett concededly had no personal knowledge as to this, and the petitioner produced no record showing it. The only testimony based on personal knowledge that the stabilogauge was on the vessel, came from Britan, the petitioner's agent in Vitoria. He said he saw it in the chief

officer's room shortly before the vessel sailed. He did not, however, testify to its calibration. Captain Pardoe, who had served as the vessel's chief officer on prior voyages, was called by the petitioner and questioned at considerable length as to the stowage of ore on two of those voyages. He was not questioned concerning the vessel's stabilogauge.

Captain Barrett, in order to bring up to date stability data which he said he kept for all of the petitioner's vessels, calculated the effect on its C2–S–B1 vessels, of all the removals and additions described above. He used substantially the same method of calculation as Mr. Hischer and Mr. Wilson. His calculations, which he produced, were written in lead pencil on the back of a typewritten list of the vessels owned and operated by the petitioner as of July 1, 1948. His calculations bear the date of October 2, 1948. They showed that the changes in the Mormackite resulted in a net deduction of 670 tons from her light ship weight as built.

He then "assumed" that the Mormackite's stabilogauge was set and calibrated to a light ship weight of 4,490 tons and a KG of 27.6 ft. After a trial and error process of computation, he concluded that "cranking in" a fictitious deck load of 110 tons on the stabilogauge would compensate for the difference between the machine's calibration and the vessel's actual light ship weight of 4,661 tons and KG of 27.9 ft. He thereupon orally informed the masters of the petitioner's several C2 vessels that, "whenever they cranked a problem into" their stabilogauge they should also crank in this fictitious deck load. While he thought he had so informed all masters of C2 vessels, he was "sure" only as to Captain McMahon and such other masters, unnamed, as "came on to one of those ships while [he] was setting up tonnage figures"; i. e., on or about October 2, 1948. No master of a C2 vessel was called to corroborate this. Captain Pardoe was not questioned about it.

Captain McMahon concededly did not become master of the Mormackite until July 1954. Captain Barrett said he warned Captain McMahon of the need to make the foregoing compensation when the latter came in for his sailing orders at the time or shortly before he left New York to take command of the Mormackite at Baltimore; and that he then saw Captain McMahon "write something, some figures, as he talked, on the back of his loading particulars."

Captain Barrett could recall no other instance when information of comparable importance was transmitted to masters orally rather than in writing, and he could think of no reason why an exception was made in this instance.

The Mormackite's light ship weight was never as low as 4,490 tons. The petitioner's records, including Captain Barrett's calculations, show the following. When the vessel was built in 1945, with armament and permanent ballast, it was 5,328 tons; after removal of all armament and ballast in 1947, it was 4,620 tons; after the additions were made in the summer of 1948, it was 4,661 tons. There was, therefore, no factual basis whatever for equipping the Mormackite, as Captain Barrett assumed the petitioner did in 1947 or 1948, with a stabilogauge calibrated to a light ship weight of 4,490 tons and a KG of 27.6 ft. Indeed his only reason for assuming her stabilogauge was so calibrated, was a singularly odd one. It was merely that, at the time he was making his calculations he "saw on the [petitioner's] pier" a stabilogauge which was so calibrated. He did not purchase any stabilogauges for use on the petitioner's vessels. He did not know when those on any of the petitioner's C2 vessels were purchased. He said Captain Furey ordered them. The latter, in his deposition, did not say whether he did or when. The petitioner produced no record concerning their purchase.

During his direct testimony about his 1948 calculations, Captain Barrett volun-

teered the statement that "they were buying stability gauges [sic] for the ship." He did not elaborate on this, and so it is not clear whether the ship he had in mind was the Mormackite. In context, the statement appears to imply that her stabilogauge was bought on or about October 2, 1948. On cross-examination, however, he said he thought stabilogauges were put on the C2 vessels during the summer of 1947.

Captain Barrett's warning about the need to correct the stabilogauges was given only to masters; and even to them, only orally. There is no evidence that any of the petitioner's chief officers, who customarily supervise stowage, were so warned although the petitioner's regular practice was to furnish its chief officers with copies of all of Captain Furey's written instructions to masters respecting matters affecting seaworthiness.

Captain McMahon's immediate predecessor in command of the Mormackite was Captain Evans. Captain Barrett thought Captain Evans was one of those he had warned of the need to correct the stabilogauge. There was no evidence that Captain Evans had noted this on the vessel's stability booklet. Captain Evans died before the trial and no deposition of his was read. Captain Pardoe, who had served as the vessel's chief officer under Captain Evans, was not asked if he had any knowledge of the need for correcting the stabilogauge or whether any warning to do so was noted in the stability booklet. .

It was the petitioner's practice to equip its vessels with stabilogauges. It is a rational inference, therefore, that when she was first put into operation by the petitioner as the government's agent in May, 1945, the Mormackite was equipped with a stabilogauge; and that this was correctly calibrated to her then light ship weight of 5,328 tons and KG of 25.82 ft. I find the vessel was so equipped when she was put into operation in May, 1945.

There was no evidence that this stabilogauge was replaced when the petitioner bought the vessel; or that it was recalibrated as her light ship weight was changed from time to time by the removal of armaments and ballast between the end of 1945 and February, 1947, or in 1948 after the additions were made. Captain Furey did say in his deposition that "any alterations that the ship received *after we bought her* were compensated for by the stabilogauge" [emphasis supplied]. He did not say her original stabilogauge had been replaced or recalibrated. His quoted testimony, in context, is at least ambiguous. If by it he meant to say that Captain Barrett's oral warning to masters to crank in the fictitious deck load, effected "compensation" of the vessel's original stabilogauge, he was clearly wrong. Captain Barrett's warning obviously did not do that. The petitioner offered no evidence other than that of Captains Barrett and Furey as to how the stabilogauge on the Mormackite on September 25, 1954, was in fact calibrated.

Captain McMahon had never commanded or served as chief officer on a C2–S–B1 vessel prior to his assignment to the Mormackite. He had never before loaded ore at Vitoria on any vessel. On two voyages he had commanded Liberty Ships of the petitioner which loaded ore at Rio de Janeiro. At that port hand trimming is used to spread the ore out to the sides and bulkheads. Hand trimming is not used at Vitoria and was not used on this occasion. Chief Officer Richardson, as far as appears, had never served as chief officer on a C2–S–B1 vessel or supervised stowage of ore at Vitoria on that type vessel. Prior to her fatal voyage the Mormackite had never loaded ore at Vitoria, although other C2 vessels of the petitioner had, and completed their voyages safely.

If, as the testimony shows was certainly possible and even probable, the stabilogauge which the petitioner furnished for the use of Captain McMahon

and Chief Officer Richardson on the Mormackite was calibrated to her original light ship weight of 5,328 tons and KG of 25.82 ft., they were sure to be misled in planning the stowage for what turned out to be their last voyage. As far as appears from this record, it certainly seems possible and indeed probable that, so calibrated, the stabilogauge would have shown that, with the ore stowed fairly flat and only in such compartments as the petitioner contends it was in fact stowed, the vessel would have had a GM considerably larger than 5% of her beam width, i. e., 3.15 ft., the amount which Furey, in writing, had advised all masters was desirable. It might indeed, for all that appears, have shown a GM so large as to indicate stiffness, a dangerous condition for vessels carrying ore which Captain Furey in writing, had directed all the petitioner's masters to avoid. In that event, it is to be presumed the officers would have revised their proposed plan of stowage in order to raise the cargo's, and hence the vessel's, center of gravity; and thus correspondingly reduce her GM. This they could have accomplished either by increasing the quantity of ore to be stowed in the 'tweendecks, or by having it stowed in high piles in the holds, or both. A stowage plan produced from the petitioner's files shows they did both.

This plan, though from its own files, was repudiated by the petitioner. This will be considered shortly. At this point it will be convenient to consider another of the petitioner's contentions. This is that, regardless of how the stabilogauge was calibrated, there was on board documentary stability data which "was accurate within the range of practical men" and sufficient for the officers to plan a distribution of cargo which would result in a stable vessel at departure. While the validity of this contention is not entirely clear from the evidence, it may be accepted. It is difficult, however, to see how it advances the petitioner's argument. The stabilogauge on the vessel was calibrated either to a light ship weight and KG she never had, according to Captain Barrett, or to her original light ship weight and KG which were no longer correct. The petitioner put the stabilogauge on the vessel to be used instead of the "very, very complicated mathematical calculation." It surely expected and intended that it would be relied upon and used.[4] The petitioner was responsible for its inaccuracy.

The petitioner's regulations required that stowage plans be prepared and forwarded showing the distribution of cargo. During pre-trial discovery proceedings, the petitioner produced from its files a stowage plan which on its face purports to show the distribution of cargo and other data relevant to the Mormackite's condition when she left Vitoria on her final voyage. In general form it is similar to plans introduced by the petitioner to show distribution of cargo on the Mormackite and other vessels on other voyages. It was received, over the petitioner's objection, as claimant's Ex. 4. It shows the hatches closed between No. 2 upper and lower 'tweendecks, between No. 3 lower 'tweendeck and lower hold, and between No. 4 upper and lower 'tweendecks; hatches open between No. 1 lower 'tweendeck and lower hold, and between Nos. 3 and 5 upper and lower 'tweendecks; the ore in No. 1 lower hold extending up through the hatch into No. 1 lower 'tweendeck; the ore in Nos. 3 and 5 lower 'tweendecks extending up through the hatches into Nos. 3 and 5 upper 'tweendecks.

The petitioner vigorously contends that this stowage plan is wrong in so far as it shows that the ore extended up through open hatches into upper compartments. The contention is based on the testimony of stevedores who loaded the vessel at Vitoria, two engineers who at different times were in charge of the

4. See Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed. 2d 511.

ore dock there, and an independent engineering expert, Dr. Finch.

The stevedores' testimony was introduced by their depositions taken in March, 1956. Its general tenor was that, when the loading was finished there was no ore in No. 1 lower 'tweendeck or in Nos. 3 and 5 upper 'tweendecks; that the hatches between these compartments and those below them were closed; that there was ore only in Nos. 1 and 3 lower holds, in Nos. 2, 3, 4 and 5 lower 'tweendecks and in Nos. 2 and 4 upper 'tweendecks; that the ore in those compartments extended to a height of from 1 ft. 6 in. to 1 ft. 10 in. at the sides and fore and aft bulkheads; that the top of each pile, while not flat, was only moderately curved as indicated in the petitioner's Ex. 83; and that the tops of the piles were several feet below the hatch beams.

One of the superintendents testified by deposition taken in March, 1956. The other testified in person. Neither was employed at the dock until long after the Mormackite was loaded there. Neither had any personal knowledge as to how the ore was in fact stowed. Both said, in substance, that the loading machinery is designed to and in fact does spread or trim the ore throughout all compartments so as to produce a fairly flat stow, thus eliminating the need for hand trimming.

Dr. Finch testified in person. He was asked to assume that the shape of the ore in No. 1 lower hold and in Nos. 3 and 5 lower 'tweendecks was as the stevedores described it; that is, that the base of the pile of ore in each of those compartments was coextensive with the full deck area of the compartment and extended to a minimum height of 1½ ft. at the sides and bulkheads. He concluded from calculations based on this assumption and on the known dimensions of the compartments, that the quantities of ore in No. 1 lower hold and in Nos. 3 and 5 lower 'tweendecks were, respectively, insufficient to form piles in those compartments

high enough to extend through the hatches into the compartments above. This conclusion is rejected because, as will appear, I find the facts do not support the assumption Dr. Finch was asked to make.

I find that the ore in the lower holds and lower 'tweendecks was not stowed as the stevedores described; that the bases of these piles of ore were not, as Dr. Finch assumed, coextensive with the deck areas of the compartments and did not extend to a height of at least 1½ ft. at the sides and bulkheads.

It is not disputed that, when ore is merely dropped by chute or bucket into a cargo compartment it piles up to a height which depends on the quantity of ore. If that is sufficient, the pile will extend up through the hatch into the compartment above. Captain Pardoe testified that this occurred when, while he was her chief officer, the Mormackite loaded ore at Narvik in January, 1950; and that because of it the ore began to shift after the vessel left the dock; and that her then master, Captain Evans, had the crew hand trim the ore out to the sides and bulkheads of the compartments.

Several survivors testified at the trial that the ore piles they saw in some compartments were in the shape of high cones; that in No. 3, the pile extended from the lower 'tweendeck into the upper 'tweendeck. Their testimony is sharply assailed and I am strongly urged to reject it on three grounds: that at the times they claim to have seen the ore piles, these witnesses were either just going to or returning from "beguiling pursuits ashore"; that their testimony at the trial varied materially from what they had said previously at a Coast Guard hearing in Norfolk, Virginia; and that they are interested in the outcome of this litigation. Why it is thought the anticipation or effect of "beguiling pursuits ashore" devaluates only their trial testimony, and not their testimony before the Coast Guard as well, is

not apparent and it was not explained. The survivors are indeed interested. And there was some variance. However, their examination by the Coast Guard officials took place only a few days after their rescue. It was conducted in the hospital, while they were still undergoing treatment for the effects of two days and nights of exposure on dunnage and driftwood in the open sea. Only 11 survived of the 45 men who got off the vessel. It would be surprising indeed if their then recollection of how the ore piles appeared on September 24 and 25 had not been dulled by their more recent preoccupation with the pressing problems of survival briefly described in the third paragraph of the petition, quoted above. In any event, their trial testimony concerning the shape of the ore piles is corroborated by the Mormackite's stowage plan, claimant's Ex. 4. This, unless found to be a complete fabrication by someone interested in these claims and who also had access to the petitioner's files, must have been made by the ship's master or her chief officer and forwarded to the petitioner before the vessel sailed on September 25. There is, in the evidence, no basis whatever for finding it a fabrication; or for supposing it was surreptitiously inserted in the petitioner's files. I find it was prepared by the vessel's master or chief officer and forwarded to the petitioner, in accordance with its regulations and the usual practice of its ship's officers. There is certainly no basis for supposing, and there is indeed no claim, that it was prepared with an eye to litigation arising from the loss of the vessel. I find it was not.

In the circumstances, it was surely to the advantage of the ore dock superintendents to maintain the asserted excellence of their company's loading facilities. And it is quite unlikely that the stevedores would admit any inefficiency of their own in the loading of a vessel whose cargo, in expectable conditions of sea and weather, shifted so much and so fast that she turned over and sank in a few hours, with great loss of life. The Vitoria witnesses then, were not, as the petitioner contends, necessarily completely objective; although, to be sure, their interest is of a very different kind and not nearly so great as the survivors'. What is, in any event, more important in evaluating their testimony is that, a year and a half had intervened between their loading of the Mormackite and the stevedores' depositions. They had loaded a great many other vessels in that period. It is, therefore, altogether probable that, in entire good faith, they attributed to the stow of the Mormackite, features they observed more recently on other vessels.

I think it is clear from all the relevant evidence, particularly that showing the physical dimensions of the vessel and the loading machinery, and I find accordingly that, the ore was not trimmed out to a height of 1½ to 2 ft. at the sides and fore and aft bulkheads of the lower 'tweendecks and lower holds of the Mormackite, thus producing an almost level stow, as the Vitoria witnesses testified and the petitioner contends.

All the vessel's hatches were but 20 ft. wide. Their respective lengths were, No. 1, 27 ft.; No. 2, 32½ ft.; No. 3, 35 ft.; Nos. 4 and 5, 30 ft. The heights of the 'tweendeck compartments and holds were, upper 'tweendecks, 12 ft.; lower 'tweendecks, 10 ft.; holds, 20 ft. The deck dimensions of the compartments which the petitioner contends were the only ones in which ore was stowed were as follows: No. 1 lower hold, 67 ft. x 9 ft. fore x 44 ft. aft; No. 2 upper 'tweendeck, 62 ft. x 56 ft. fore x 64 ft. aft; No. 2 lower 'tweendeck, 62 ft. x 53 ft. fore x 64 ft. aft; No. 3 lower 'tweendeck, 70 ft. x 64 ft. fore and aft; No. 3 lower hold, 70 ft. x 57 ft. fore x 60 ft. aft; No. 4 upper 'tweendeck, 70 ft. x 64 ft. fore x 58 ft. aft; No. 4 lower 'tweendeck, 70 ft. x 64 ft. fore x 54 ft. aft; No. 5 lower 'tweendeck, 67 ft. x 48 ft. fore x 8 ft. aft.

The loading machinery at Vitoria consists of three towers. Each is mounted

on rails on which it can be moved along the dock parallel to the vessel. A steel frame extends offshore from each tower. This supports a conveyor belt on which the ore is carried from a large hopper in the tower. The frame is of fixed length. It extends to just over the center of the vessel's hatch. It can be moved vertically 18 degrees from the horizontal; and 30 degrees to right and left in the horizontal plane. At the end of the frame is a small hopper about 2 ft. deep into which the ore drops from the conveyor belt and then into a chute about 13 ft. long which is hinged to the bottom of the hopper. At the end of the chute ropes are attached by which the stevedores can move it and thus change the direction of the ore.

The Mormackite's hatch coamings extended 2 ft. above and 1½ ft. below the top deck; 9 in. above and 2 ft. below the upper 'tweendeck; 3 in. above and 2½ ft. below the lower 'tweendeck.

She had five 'thwartship beams in No. 1 lower 'tweendeck hatch and in all upper 'tweendeck hatches except No. 3. She had seven 'thwartship beams in No. 3 upper and lower 'tweendeck hatches. All beams were in place while the ore was being loaded.

With the frame resting on the top deck hatch coaming, the end of the chute, when that was in any position other than hanging vertically from the end of the frame, could not reach beyond the lower edge of the hatch coaming below the upper 'tweendeck. It could not, therefore, as the petitioner contends, "wing the ore" out to the ship's side in the lower 'tweendeck compartments to a height of 1½ ft. to 1 ft. 10 in. The best it could do was drop the ore onto the lower 'tweendeck a short distance beyond the edge of the hatch towards the sides. Even when the chute was hanging vertically from the frame, the end could not reach more than 3 ft. below the upper 'tweendecks into the center of the lower 'tweendeck compartments. Thus it could not possibly extend into the lower holds.

And it was impossible for the chute, hanging at any angle from the frame, to pile the ore to a height of 1½ ft. to 1 ft. 10 in. at the sides of the lower holds. Furthermore, the presence of the beams in the upper 'tweendeck hatches made it impossible to swing the chute towards the fore and aft bulkheads in the lower 'tweendecks and lower holds without, from time to time, raising the frame so that the end of the chute could clear the beams in the upper 'tweendeck hatches. There was no testimony that this was done. Neither was it shown how high the frame would have to have been raised to accomplish it. It is obvious, however, that if this required raising the frame much above the horizontal, the result would be at least a reduction in the speed of the ore's movement along the conveyor belt or in the volume of ore the belt could pick up from the tower, or both. Either result would certainly have delayed the loading beyond the time the dock's records show was consumed in the operation. Furthermore, such ore as struck the beams would be deflected and would fall straight down.

I find the ore was stowed as indicated on the stowage plan, claimant's Ex. 4; that is, the ore in No. 1 lower hold was piled up through the hatch into No. 1 lower 'tweendeck; in Nos. 3 and 5 lower 'tweendecks the ore was piled up through the hatches into the upper 'tweendecks.

Dr. Manning, the only expert who was questioned about it, was unable to compute the amount of ore represented by the curved lines in No. 1 lower 'tweendeck and Nos. 3 and 5 upper 'tweendecks; or to calculate the center of gravity of that ore; or the height and center of gravity of the piles in any of the compartments as shown on the stowage plan produced by the petitioner. He could not, therefore, and no other expert attempted to, calculate the vessel's stability when she sailed with her cargo stowed as that plan showed. It seems obvious, however, that the ore in the

lower holds was almost sure to shift in heavy weather, and that there was more ore high in the vessel than was safe for one sure to encounter such weather on her intended voyage.

The petitioner's expert, Mr. Wilson, is a consulting naval architect of long and impressive experience. He was graduated in 1914 from Webb Institute of Naval Architecture. He was with the American Bureau of Shipping from 1917 until his retirement in 1950. He was by then its director of research. He made calculations of the kind Captain Furey said "were very, very complicated * * * which the stabilogauge is designed to do away with." Mr. Wilson's were indeed extensive and complicated. They were based on her actual light ship weight and KG of 4,661 tons and 27.90 ft. They showed that when she sailed for Vitoria, the Mormackite's GM was 4 ft. 9 in. This, concededly, indicates quite adequate stability. Indeed it is substantially larger than Captain Furey said was "desirable." Mr. Wilson conceded, however, that his conclusion as to her GM was valid only if the ore was in fact stowed as he was asked to assume, i. e., as the stevedores described—petitioner's Ex. 83. Since I have found that the ore was not so stowed, his conclusion as to the vessel's GM on departure from Vitoria is rejected. For the same reason, I reject his opinion that the ore was not likely to shift during the voyage and that, therefore, when she sailed, the vessel was seaworthy as to stowage.

The claimants' expert, Dr. Manning, is and for many years has been professor of Naval Architecture at Massachusetts Institute of Technology. He is a graduate of the United States Naval Academy on whose faculty he has also served. He has lectured at, and has been honored by, other institutions both in this country and abroad. Dr. Manning agreed with Mr. Wilson that, if the ore was in fact stowed as the stevedores described it, the vessel would have been stable and seaworthy as to stowage when she sailed.

However, he was also of the opinion that the loading machines could not have stowed the ore on the Mormackite as the stevedores described it. He thought the best possible result the machines could have produced on her was to pile the ore in the form of truncated pyramids the tops of which were fairly flat and equal in area to the square of the hatches but whose bases did not reach the sides or bulkheads of the lower holds and lower 'tweendecks. On the assumption, which he was asked to make, that it was thus stowed, he calculated a GM at departure which, though much smaller than Mr. Wilson calculated, was adequate. Dr. Manning, however, was of the opinion that, so stowed, the ore was capable of shifting transversely at a small angle of roll; and for that reason the vessel was unseaworthy as to stowage when she sailed.

The stow which Dr. Manning was asked to assume is contrary to that shown on the stowage plan for the voyage—claimants' Ex. 4. I find, therefore, that the ore was not stowed as he was asked to assume. This makes irrelevant his conclusion as to the vessel's GM at departure with the ore so stowed.

■ The petitioner introduced much evidence to show that it is customary in both foreign and American vessels, to stow ore in high piles; and that vessels so stowed have survived far more severe weather than the Mormackite encountered. Most of the vessels involved were of different design from the Mormackite. And most were loaded at ports where hand trimming is used to spread the ore out to the sides and bulkheads of the compartments. Many vessels have been loaded by the machines at Vitoria, among them vessels of the C2–S–B1 type; and these too have survived severe weather. From this it is argued that, since the Mormackite's ore was stowed in the customary manner, it was proper and, therefore, seaworthy. The contention is rejected. Usual practices, while relevant,

are not the sole standard of proper care and diligence.[5]

The petitioner contends that Richardson alone supervised and directed the stowage which if bad, was so, solely because of his negligence; that he personally ordered speed increased at 8:30; that when the vessel was "in extremis" he wholly neglected his duty, "issued no orders," but "personally attempted a seaman's work in hauling fire hoses" to the sounding pipes; and that he failed to order the lifeboats lowered while that was still possible.

The petitioner contends that Wall, the chief engineer, abandoned his engine room command when the vessel was "in extremis"; used only fire hoses instead of the powerful cargo pumps to ballast the tanks; and "did nothing" when some of the crew in his presence suggested to Richardson that the boats be lowered.

■ The petitioner's regulations permit a master to delegate "supervision" of stowage to his chief officer. It is customary for masters to do this. Just what is meant by "supervision" in this context was not made clear. The evidence here shows that Captain McMahon stayed on board throughout the loading. Coehlo, the stevedore foreman, testified that while he got his orders from Richardson, the master was around the vessel all the time. Stability of a loaded vessel is, and the petitioner's regulations so provide, the sole responsibility of the master. It depends largely on her stowage. While Captain McMahon left to Richardson actual direction of stevedores, it is a reasonable inference from all the evidence that, on this his first command of the Mormackite, a vessel larger and different from any he had previously commanded, he did not leave the planning of her stowage to his chief officer alone. As far as appears, they had not served together before. Moreover he surely did not stay aboard and go about his ship all during the loading operation just as a mere spectator. I find

he supervised the planning of the stowage and approved the work when completed.

It has already been found that Captain McMahon, not Richardson, ordered the increase in speed.

■ Neither of the vessel's two lifeboats was lowered and, as far as appears, there was no attempt to do so. I find the master did not order them lowered. It is inconceivable that no attempt would have been made to carry out his command to do so if he had issued it. Surely, however, since he was in full command at all times, the chief officer and chief engineer could not, as the petitioner contends, usurp his authority and ~~ue such an order. These officers were subject to the master's orders. They were bound by their contract of employment to obey him. There was no evidence of any conditions which might have required or justified relieving him of command. The failure to lower a boat, therefore, was not due to any negligence of Richardson or Wall. If any negligence was responsible for that failure, it was the master's. In view of this finding, the matter might well be left here, since the claims by and against the master's representative have been settled. But the evidence, in any event, is insufficient to support a finding that the master was negligent, and the burden of proof on that issue was on the petitioner. The only testimony that a boat could have been lowered safely is that of a few seamen. In light of all the circumstances in which their opinion was formed, I do not accept it as a reliable standard of what was feasible while the vessel's condition was deteriorating so rapidly. The reasonable inference from all the evidence is that, the continued shifting of the heavy ore so quickly increased the very severe shift and list which occurred at 8:30, that a boat could not have been lowered safely at any time thereafter.

The other charges against Richardson and Wall are disposed of adversely to the

---

5. Troupe v. Chicago, Duluth & Georgian Bay Transit Co., 2 Cir., 234 F.2d 253, at page 258; The T. J. Hooper, 2 Cir., supra.

petitioner, by the previous findings as to the events of the fatal morning.

The radio operator got off the vessel. He had with him a portable sending instrument. He tried to set it up on a piece of dunnage. Sea water rendered it useless and he was unable to send a message. He disappeared some time during the first night. Some of the survivors said he told them he had attempted to send a message. It is not clear whether this was made while he was yet on the vessel or it was the attempt he made with the portable set while he was in the water. He was also quoted as having said he thought he had the wrong location for the vessel. It is also unclear whether, if he made the attempt while on the vessel, the failure to get off a message resulted from a lack of electric power. It is not known whether the vessel's engines were stopped as she listed beyond recovery, although it is to be expected that this would have been done to make sure her propeller would not endanger those who would go over her side. When she took the severe list at 8:30, the auxiliary generator was thrown to the deck and in all likelihood put out of order. It certainly was not proved by the petitioner, whose burden that was, that the radio operator was negligent or that this contributed to the loss of his life and others'.

The Mormackite was equipped with a stabilogauge which was wrongly calibrated. This is clear whether it was calibrated as Captain Barrett "assumed" or, as is quite probable, calibrated to the light ship weight and KG to which she was built. This dangerous condition resulted from the serious neglect of the petitioner's managing officials in New York, Captains Furey, Mayo and Barrett.

This defective stabilogauge resulted in unseaworthy stowage which the master helped plan and which he approved.

■ The loss of life and the injuries to the survivors occurred through causes for which the petitioner is liable and with its privity and knowledge. It is, therefore, not entitled to limit its liability as to the claims of the survivors and the claims of the representatives of the deceased.

■ The United States Carriage of Goods by Sea Act [6] was incorporated in the bill of lading covering the cocoa beans. It was also incorporated in the charter under which the ore was carried. Thus the petitioner's liability to both cargo owners is controlled by the provisions of that Act.[7] On the findings heretofore made I further find that the petitioner did not exercise due diligence to make the Mormackite seaworthy.

The death and personal injury claimants stipulated to waive a jury and to try the issue of their damages before the court. The court agreed to try those issues, and this will be done at a time to be agreed on by the parties and the court. The issues as to damages due the cargo claimants will, as I understand the parties prefer, be referred to a Special Master.

A decree in accordance herewith may be submitted on notice.

---

6. 46 U.S.C.A. § 1300 ff.

7. United States v. Wessel, Duval & Co., D.C.S.D.N.Y., 115 F.Supp. 678.