Michael **KUBERSKI**, Plaintiff-Appellee,

v.

**NEW YORK CENTRAL RAILROAD COMPANY**, Defendant-Appellant.

No. 40, Docket 29412.

United States Court of Appeals
Second Circuit.

Argued Oct. 7, 1965.

Decided April 13, 1966.

Hays, Circuit Judge, dissented.

Fenton F. Harrison, Gaughan, Lankes & Baum, Coffey, Heffernan & Harrison, Buffalo, N. Y., for plaintiff-appellee.

Howard G. Munson, Hiscock, Cowie, Bruce, Lee & Mawhinney, Syracuse, N. Y., for defendant-appellant.

Before LUMBARD, Chief Judge, and WATERMAN and HAYS, Circuit Judges.

WATERMAN, Circuit Judge:

Chief Judge Lumbard, who joins with me in this opinion, and I are both of the belief that the plaintiff failed to prove any negligence on the part of the defendant railroad that contributed in any way to the plaintiff's injury, and that the trial judge, after a jury verdict for the plaintiff, should have granted the railroad's motion for a directed verdict and for judgment notwithstanding the verdict.

Michael Kuberski, the plaintiff-appellee, had been employed by the defendant-appellant railroad since 1941 and had worked as a car inspector since 1942. One of the duties of a car inspector is to close all open doors of boxcars before a train leaves the yards. On August 24, 1960, the night of his injury, the plaintiff was inspecting a train known as the "Buffalo Extra" in the defendant's De-Witt yards. The jury could have found that this night this inspection had been delayed and some speed in carrying it out was required. Moreover, the train had been "humped," and it was likely that some of the boxcar doors would have been jarred open in this process. Plaintiff started on the south side of the train, his partner Barth started on the north side, and thus paired they proceeded to inspect each car, moving from east to west along the train. Two other inspectors were simultaneously inspecting other cars on the same track.

Barth and the plaintiff had in this manner inspected between twelve and

fourteen cars when Barth called for assistance in closing an open boxcar door. The plaintiff responded to this call and began to climb over the coupler between the cars in order to reach the north side where he would be in a position to help Barth. The plaintiff testified that in thus climbing between the cars he used both hands to clutch "grab irons" and that consequently the hand torch he carried shone above his head and not on his potential footholds. He testified that he placed his left foot on an operating lever some three feet above the ground, then pulled himself up to put his right foot on top of the coupler, and then fell forward onto the ground on the north side of the train, injuring himself.[1] He testified he could not see where he was stepping and admitted he could not be sure whether he had tripped or slipped, and made no claim that he had done either. In fact, he candidly admitted he did not really know how his fall occurred.

As a consequence of this injury the plaintiff worked less than full time during the four years from the accident to the trial and lost approximately $2,000 a year in wages; he also incurred certain medical expenses, and there was testimony tending to prove that he suffered a permanent partial disability. Action was commenced in the Northern District of New York against the railroad, under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60, to recover damages for these injuries. Trial was held before Judge Port and a jury in the latter part of September 1964 and resulted in a general verdict for plaintiff in the amount of $20,000. The defendant appealed, contending, *inter alia*, that the verdict should have been set aside and the complaint dismissed because the plaintiff failed to prove negligence on the part of the defendant. We agree, and reverse with instructions that judgment be entered for the defendant.

■ There is absolutely no evidence in the record tending to show that the operating lever on which the plaintiff stepped, or the coupler, or any other equipment, was defective. Indeed, plaintiff specifically states in his brief that he makes no claim that there was any defect in either the lever or the coupler. Moreover, the record is devoid of evidence tending to show that it was negligent of the defendant to allow car inspectors to perform their duties in a yard illuminated as was the DeWitt yard on the night plaintiff was injured, and in plaintiff's brief he states that it was no part of his claim that "darkness per se was the cause of his injury." No jury could have found that improper lighting was in any sense the cause of the injury, there being no evidence to support such a finding. In FELA cases a minimal scintilla of evidence may support a jury verdict, but we ought not to sustain verdicts that can only be based on speculation.

■ Undaunted by this lack of evidence of any negligence on the part of the carrier, the plaintiff argues there is sufficient evidence to support the jury's verdict on the theory that the railroad was negligent in failing to have a motor scooter supplied with door closing equipment accompany him and his partner as they carried out their appointed task. Had such a scooter been present, plaintiff argues, Barth would not have required any assistance in closing the door, for Barth could have helped himself to a door puller from the scooter and closed the door himself. Plaintiff claims the testimony at trial established that a scooter with door closing equipment usually accompanied car inspectors and

---

1. On direct examination plaintiff testified:
   Well, I placed my left foot on the operating lever which is on my side. I placed my left foot there and as I pushed myself with my right foot, because it is about 36 inches or so off the ground, I went over to put my right foot on top of the coupler when just something happened where I—well, I just fell and I found myself on the other side of the car, and I fell on my right knee, and that is where I sat.
   On cross-examination his testimony was similar, and several times he admitted that he did not know how the accident occurred.

that it was "good railroad practice" to have a scooter do so. From this premise he goes on to argue that a jury could fairly conclude that the railroad should have foreseen that if the scooter did not accompany the car inspectors an inspector might be tempted to cross between the cars in order to aid his partner in manually closing a door, and should have foreseen the attendant risk that the inspector in so crossing at night might miss his footing and fall. Petitioner concludes that this evidence is enough to support the jury's verdict since the jury question involved is "whether there was evidence that *any* employer negligence caused the harm, or, more precisely, enough to justify a jury's determination that employer negligence had played *any* role in producing the harm." Gallick v. B. & O. R.R., 372 U.S. 108, 116, 83 S.Ct. 659, 664, 9 L.Ed.2d 618 (1963); Inman v. B. & O. R.R., 361 U.S. 138, 80 S.Ct. 242, 4 L.Ed.2d 198 (1959); Rogers v. Missouri Pac. R.R., 352 U.S. 500, 506–507, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).

■■ This ingenious theory has, however, certain fatal limitations. As we previously noted, the record is devoid of evidence tending to show that the equipment on which the plaintiff stepped was defective. And there is no evidence tending to show the DeWitt yard, illuminated as it was, was not a safe place to work. It is fundamental in FELA cases that the fact an employee is injured is not proof of negligence of the carrier. Moore v. Chesapeake & O. Ry. Co., 340 U.S. 573, 577–578, 71 S.Ct. 428, 95 L.Ed. 547 (1951). Here if there were negligence plaintiff would ground it upon defendant's failure to have a scooter loaded with door-closing equipment *accompany* the plaintiff and his partner. If, as the plaintiff urges, it was good industry practice to have a scooter *accompany* each pair of inspectors we would have no

trouble concluding that there had been a failure to comply with that practice. But the record establishes only that it was good industry practice to have a motor scooter *readily accessible* to the two or three pairs of car inspectors that ordinarily inspected a train the length of the "Buffalo Extra"; it does not establish that it was good industry practice to have a scooter *accompany* each pair of inspectors.[2] If "good industry practice" is to be the touchstone differentiating negligent from non-negligent conduct, it would seem to be imperative for the plaintiff to prove that the scooter, contrary to good industry practice, was not *readily accessible* to him and his partner. This the plaintiff has not done. Indeed, the evidence suggests that the scooter, arriving so soon after the accident, was readily accessible to all the inspectors working on the train that night.

■ Of course, industry practice is not always the measure of proper diligence. In some cases "a whole calling may have unduly lagged in the adoption of new and available devices." The T. J. Hooper, 60 F.2d 737, 740 (2 Cir. 1932). In such cases courts have properly felt free to hold that higher standards are required. But to invoke this line of cases there should first be introduced some evidence that the general practice of the industry is not a reasonably prudent practice. The plaintiff made no attempt to introduce such evidence. We thus are unable to save the verdict by assuming that the jury concluded the prevailing industry practice was an insufficient one. Such a conclusion would be improper for us to reach because there is no evidence in the record on which it might have been, or could be, based.

■ The issue here of appellant's negligence *vel non* turns on whether the scooter was readily accessible. Our dis-

---

2. To the contrary, there was testimony tending to show that ordinarily car inspectors would note any open doors that one inspector could not close manually and would then report these open doors at the conclusion of their inspection; and that a scooter would then be dispatched with equipment to close all the doors reported by all the teams of inspectors that had worked on the train.

senting colleague agrees with this formulation of the issue, but concludes that a reasonable jury might have found on the basis of the evidence that the scooter was not readily accessible to Barth and appellee as they inspected the train. Established rules of evidence teach us that the appellee had the burden of producing evidence tending to show that the scooter was not readily accessible. McCormick, Evidence § 306 (1954). The appellee failed to meet this burden, which is not surprising because the issue of ready accessibility was not focused at the trial.[3] According to the dissent, the fact the scooter arrived ten minutes after Barth went for help and the fact Kimber could not with certainty remember whether he had assigned the scooter to assist the team of inspectors inspecting the Buffalo Extra[4] satisfied appellee's burden of production. We disagree. A reasonable man could only infer from the fact the scooter arrived ten minutes after Barth went for help that it was in the immediate area. After all, it took only ten minutes for Barth on foot to search out the scooter, wherever it was, acquaint the driver with the situation, and return with the scooter to the scene. There is no record evidence tending to show that "readily accessible" scooters invariably, frequently, or even sometimes, arrived earlier than ten minutes after they were summoned. On such a record, a scooter that appears within ten minutes after it is summoned must be considered to have been readily accessible. The only other bit of circumstantial evidence relied upon in the dissent as tending to prove that the scooter was not readily accessible to appellee and Barth was Kimber's statement that he was not sure whether he had assigned the scooter to assist the Buffalo Extra inspection team on the night of the injury. Even if unanswered by the defendant[5] this evidence would not "justify men of ordinary reason and fairness in affirming the question which the plaintiff is bound to maintain." 9 Wigmore, Evidence § 2494, at 299 (3d ed. 1940). The desired inference is that the scooter was not readily accessible. Kimber's testimony,[6] taken most favorably for the appellee, is probative on this issue if, but only if, the scooter would not be readily accessible to a given crew unless the foreman assigned the scooter to that crew. The record is devoid of evidence tending to establish this proposition.[7] Kimber's testimony that he was not sure of the scooter's location is therefore no more probative as tending to establish the railroad's negligence than it would be if given by a bystander.

3. To the extent that appellee's trial counsel focused on the scooter issue, he attempted to ground appellant's alleged negligence on the failure of the scooter to accompany Barth and appellee.

4. The dissent's statement that Kimber testified that he "had no idea where the scooter was at the time of the accident" deserves comment. Kimber testified that he knew the scooter was in the yard where the Buffalo Extra was being inspected. He did admit on several occasions that he was honestly uncertain as to the scooter's exact location at the time of the accident.

5. The statement in the dissent that appellant produced no evidence as to the whereabouts of the scooter should not be left unchallenged. Trial counsel for the appellant made much of the fact that the scooter arrived at the scene ten minutes after it was summoned. Surely this relatively speedy arrival tends to prove that the scooter was in the area. Does not the fact the secretary appears in her boss's office shortly after she has been summoned on the intercom tend to establish her presence in the outer office prior to the boss's call? Nevertheless, the majority opinion does not turn on our choosing between competing inferences. As we indicate in the body of this opinion, we have attempted to assess the probative worth of the Kimber testimony as if it had gone unanswered.

6. See note 4, supra.

7. Indeed, the thrust of the record evidence is that it was the customary practice for the scooter to be readily accessible to inspection crews, and that there was no reason for a foreman to take special steps to insure a scooter's accessibility.

If good industry practice is the test of an employer's diligence, and it should be the test in the absence of argument or proof to the contrary, the plaintiff must fail, for he has not shown that the scooter was not readily accessible. There is no evidence to justify a jury's determination that employer negligence played *any* role whatsoever in producing the harm the employee suffered. Compare Gallick v. B. & O. R.R., 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963). Inasmuch as the many FELA cases cited by the plaintiff are distinguishable on this ground we need not review the jury's determination that this injury was reasonably foreseeable.[8]

We reverse and order that the judgment for the plaintiff be set aside and that judgment be entered for the defendant.

HAYS, Circuit Judge (dissenting):
I respectfully dissent.

In Federal Employers' Liability Act cases there is very little scope for appellate review of jury verdicts. "Judicial appraisal * * * is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that *negligence of the employer played any part at all* in the injury or death." (Emphasis added.) Rogers v. Missouri Pacific R.R., 352 U.S. 500, 506–507, 77 S.Ct. 443, 449, 1 L.Ed.2d 493 (1957).

In the present case the facts are essentially uncontroverted and relatively simple. The inspection of the "Buffalo Extra" had been delayed and speed in carrying out the inspection was required. The train had been "humped"; some open doors were to be anticipated.

Terminal Supervisor Martin, a witness for appellant, indicated that he was "responsible for the safe, efficient, mechanical operation of all functions" in the yard. He testified that it is "good common railroad practice to have a motor car adjacent to the track that is being inspected." Martin's testimony concerning the need for the motor scooter, and its special door pulling equipment, to be readily accessible was corroborated by foreman Kimber.

There was only one motor scooter assigned to the westbound advance yard. Only one train was being inspected the night of the accident. Supervisor Martin testified:

"If there were only one train to be inspected and the motorcar was available, it would be good common sense to utilize that motorcar to expedite the handling and inspection of that train. That is the primary purpose of the motorcar."

Foreman Kimber agreed.

In reply to a question as to whether the motor scooter was "under your jurisdiction," foreman Kimber replied "Yes, absolutely." Nevertheless, Kimber testified that he could not remember whether or not he had assigned the motor scooter to accompany the inspectors, and had no idea where the scooter was at the time of the accident. Despite this damaging testimony, appellant produced no evidence as to the whereabouts of the scooter. Appellee could not reasonably have been expected to offer evidence as to the location of the scooter, especially since such information was "peculiarly in the knowledge of the adversary." McCormick, Evidence § 318 at 675 (1954).

The district court charged the jury:

"Now all of those claims center around the claim that this motorcar was not

---

8. If one assumes that railroad management ought to be aware that railroad employees deviate from ordinary safe practices in pursuing their labors, injuries like the one involved in the present case may well be foreseeable if each pair of inspectors is not accompanied by a scooter bearing heavy door closing equipment. But even if foreseeability of employee negligence can be equated with employer foreseeability of employee injury, employee injury, standing alone, is insufficient unless it can also be shown that the defendant's conduct deviated in some causative way from the standard of proper employer diligence. The plaintiff has failed to make such a showing in this case.

available. Now it is for you to determine whether that motorcar was or was not available in accordance with what would be the duty of the railroad to exercise reasonable care. That is one of the questions of fact that you will have to decide."

The scooter arrived at the scene of the accident a substantial amount of time, approximately ten minutes, after Kuberski was injured. In view of the time taken to secure the scooter, the jury could properly have found that it was not readily available and that appellant had therefore negligently failed to supply appellee with necessary tools.

Both supervisory employees, Martin and Kimber, recognized that car inspectors would attempt to close doors manually; indeed, Kimber explained:

"the procedure is for the four car-men or inspectors to come down the train and close whatever doors they can manually, and just push them aside, and if they can't on some occasions, they call to their partner who is on the other side to assist them."

It was therefore foreseeable that, because of the lack of appropriate tools, Kuberski would be called upon to cross from the south to the north side of the train. Given limitations of time, prior practice, and the natural propensity of employees to seek the quickest way, the appellant should have expected Kuberski to cross as he did rather than going over, under or around the train.

Certainly a jury was entitled to conclude that, because of appellant's negligent failure to provide the necessary tools, Kuberski was exposed to a substantial and foreseeable risk when he crossed the coupler in the darkness with only a hand lantern which shone above his head because he had to use both hands to clutch "grab irons." Appellant's failure to supply the motor scooter directly precipitated appellee's risk. Appellee's injury was, therefore, as the jury found, the direct and proximate result of appellant's negligence.

I would affirm.