**UNION MARINE & GENERAL INSURANCE COMPANY, Ltd., Plaintiff,**

v.

**AMERICAN EXPORT LINES, INC., and McRoberts Protective Agency, Inc., Defendants.**

**No. 60 Civ. 2788.**

United States District Court
S. D. New York.

Aug. 8, 1966.

---

Kelly, Donovan, Robinson & Maloof, New York City, for plaintiff; John P. Conroy, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant American Export Lines, Inc.; M. E. DeOrchis, Phillip B. Swaim, New York City, of counsel.

Abberley, Kooiman, Amon, Marcellino & Clay, New York City, for defendant McRoberts Protective Agency, Inc.; P. J. Kooiman, New York City, of counsel.

## OPINION

COOPER, District Judge.

This is a claim for cargo lost on July 21, 1959, consisting of five barrels of sheep casings shipped aboard respondent's vessel, the S.S. EXCALIBUR, from Beirut, Lebanon to Hoboken, New Jersey.

Union Marine & General Insurance Co., Ltd. (hereinafter "Union Marine"), the subrogated cargo insurer and an alien corporation authorized to do business in New York, invokes the jurisdiction of the Court on the basis of diversity of citizenship, 28 U.S.C. § 1332.[1]

Filed July 15, 1960, the complaint seeks recovery against both the carrier, American Export Lines, Inc. (hereinafter "Export") and McRoberts Protective Agency, Inc. (hereinafter "McRoberts"), a firm engaged by Export to protect cargo.

The evidence shows that all the barrels of casings involved here, valued at some $14,000, actually were last seen on July 21, 1959 while being discharged from the ship's crib at Pier B in Hoboken. When last observed, this cargo was in a hoist preliminary to discharge to the pier. Although due demand was made, the casings were never delivered to the intended consignee. Pre-Trial Order, ¶ 3(a) (6).

Union Marine predicates its claim against Export on breach of the bill of lading which incorporated the provisions of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 1300-1315. Prior to the commencement of trial, Export settled Union Marine's claim against it for the sum of $2,000.[2] Seeking indemnity in the amount of its settlement,

1. Union Marine is chartered in the United Kingdom. Jurisdiction is not contested. Pre-Trial Order, ¶ 1. On the status of alien corporations under the 1958 amendment to Section 1332 see, 1 Moore, Federal Practice ¶ 0.77 [2–3] (2d ed. 1964); Eisenberg v. Commercial Union Assurance Co., 189 F.Supp. 500 (S.D.N.Y. 1960); David Crystal, Inc. v. Cunard Steam-Ship Co., 223 F.Supp. 273, 289 n. 2 (S.D.N.Y.1963), aff'd 339 F.2d 295,

(2d Cir. 1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1340, 14 L.Ed.2d 271 (1965).

2. In settling, the parties expressly recognized, as set forth in the stipulation dated June 16, 1966, that the claim against Export was limited to $500 per barrel, because of the package limitation provided for in COGSA, 46 U.S.C. § 1304 (5).

Export, in turn, cross claims against co-defendant, McRoberts.[3]

Union Marine's direct claim against McRoberts for the balance of the $14,000 loss is sought to be buttressed on several theories: (1) warranty, (2) tort, and (3) bailment. First, the complaint (paragraph 23) alleges, in substance, that the agreement between McRoberts and Export inured to the benefit of the consignee and "defendant negligently failed to perform its duty owing to the plaintiff to adequately observe the discharge of plaintiff's cargo * * *." In its trial memorandum (pp. 23–32) Union Marine argues that McRoberts breached its warranty of workmanlike service, implied in such agreement, and that Union Marine was a third party beneficiary thereof. Alternatively, Union Marine argues that the consignee can take advantage of such a warranty even if it is not a third party beneficiary, since the warranty is not limited to the zone of direct contractual relations.

Second, in its post-trial memorandum (pp. 9–11), Union Marine cites the principle, not grounded in contract, that an agent such as McRoberts is directly liable to plaintiff for the negligent performance of responsibilities which it undertook. Third, Union Marine contended by notice dated May 2, 1966 that it would prove at trial that McRoberts, as plaintiff's cargo bailee, failed in its burden of accounting for non-delivery.

This case came on for trial on May 24 and 25 before the Court sitting without a jury. Post-trial and reply memoranda were received on June 14 and 17 respectively.

After a careful study of the total evidence adduced and the theories upon which plaintiff relies, we find plaintiff has failed to meet its requisite burden of proof.

## THE FACTS

### The Export-McRoberts Agreement

The substance of the 1958 oral agreement between Export and McRoberts is not in dispute. It provided, in essence, that the latter was to watch all cargo on the carrier's ships and piers, and be responsible for the safekeeping of "special" cargo.[4]

As more fully set forth in Exhibit 2, pp. 2–3, the agreement provided:[5]

Export designated the items of "special cargo," preparing from time to time a list of such cargo which was delivered to McRoberts. When "special cargo" was discharged or received on the pier, McRoberts arranged with Export employees for its prompt transfer to a "safe room" or "crib" where it was held under McRoberts' custody. McRoberts kept appropriate records of such cargo. Its men noted transfer to whom, by whom and when such

---

3. Filed October 10, 1960, the cross-claim alleges in pertinent part (¶ 29) that the loss "resulted from the breach of duty and/or negligence of" McRoberts. At trial, to substantiate its claim, Export adopted as binding the trial record adduced in Union Marine's case against McRoberts. The discussion which follows relates to both claims, except where noted. Tr. 71.

"Tr." followed by a number refers to a page of the Trial Transcript. "Ex." followed by a number refers to an Exhibit in evidence at trial.

4. "Special" cargo is cargo that is very valuable, such as a barrel of casings (casings are the cleaned intestines of animals, here sheep, used as a container for sausage meat), and/or highly pilferable such as items that could be carried

on the person. Tr. 5–6. Special cargo also refers to a shipment upon which a higher rate is paid so that it also receives special attention. Ex. 9, Warren Deposition, pp. 5, 21.

A barrel of casings, standing approximately three feet high by two and one half feet in diameter, was said to resemble a beer barrel. The barrels were unpainted, except for some white paint on the tops and bottoms. Each weighed 250 to 300 kilos (or, 113 to 136 pounds). Ex. 7, Fraser Deposition, p. 10; Ex. 12, Koster Deposition, p. 19; Ex. 9, Warren Deposition, p. 15; Ex. 6, Bilbool Deposition, pp. 30–31.

5. See Ex. 11, Frank McRoberts Deposition, p. 14; Ex. 5, Buckridge Deposition, pp. 5, 7–8; Tr. 7, 63.

cargo was delivered out to an authorized person.

These general responsibilities encompassed in the oral agreement seem to represent no more than the normal customs and practices, as proved at trial, incident to McRoberts' daily work.

### Security Procedures During Unloading

Special cargo is often discharged from the ship along with general cargo as it is in mixed storage in the hatches. Special cargo is usually carried in the locked compartments of a hatch called "security lockers" or "cribs," and a McRoberts guard on the ship in addition to the ship's mate (who holds the key) and crew of stevedores, is present on the outturn. McRoberts guards, stationed both on the ship and the pier, do not physically handle either special or general cargo. Tr. 23.

From its initial landing on the stringpiece, cargo is taken by the stevedores via hi-lo equipment to various "sorting piles" on the pier. Here, Export's sorter designates where on the pier general cargo is to be placed pending delivery to the consignee's trucker.

If there is special cargo expected, Export's delivery clerk prepares a list indicating the specific cargo and gives one copy each to the sorter and accompanying McRoberts guard. In the words of McRoberts' supervisor, Buckridge, "we post a man at the sorting pile with the sheet to see that those [special cargo] are put on a special pallet and sent to the crib. In other words, * * * if the sorter misses something, the guard will pick it up and send it to the crib." Ex. 13, Buckridge Deposition, pp. 7–8.

At trial Buckridge testified that the usual procedure with respect to special cargo is to also have a guard at the stringpiece. "He sees that they go over to the sorting pile." Tr. 28. Whereas it is Buckridge's duty to assign men to their individual posts, Tr. 4 (but see Ex. 2, p. 2), the carrier determines the number of men McRoberts would use on each pier. Ex. 2, pp. 1–2.

### The Cargo Loss

Turning our attention to the day in question, July 21, 1959, the five barrels of casings were last seen as they were lifted over the vessel, after being taken from the crib in hatch no. 2. Ex. 9, Warren Deposition, p. 19. Although there was no direct evidence that the barrels landed on the pier, it may be so inferred under the circumstances.

According to Buckridge's uncontroverted testimony, there was no guard stationed at the stringpiece, because George Hinte, the McRoberts guard at the sorting pile "was so close to the stringpiece he had it in view all the time." Tr. 45, 53–54.[6]

Furthermore, while there was no liaison between Cusimano, the McRoberts guard at hatch no. 2, and other McRoberts guards on the pier,[7] this procedure is compelled neither by the agreement nor by custom and usage. Tr. 22.

There being no credible evidence otherwise, we find, contrary to what should have taken place, that the casings were not on the list of special cargo compiled by Export's clerk and given to McRoberts personnel on the pier. Tr. 8–9, 34, 44.

### THE LAW

#### Breach of Warranty

▬ With regard to the alleged breach of warranty, we find general maritime law applicable. The general rule is that a maritime contract is one having reference to maritime transac-

---

6. There is no claim here that Hinte was not able to perform his duty at the sorting pile as well as adequately observe what was taking place at the stringpiece. Although there was no showing that Hinte was unavailable, neither side called him as a witness. We draw no inferences from his non-appearance at trial.

7. Pier B is 949 feet by 103, and was secured by four guards on the 21st, two of whom were stationary. Tr. 20, 29–30. The pier was characterized as having a "lot of cargo" on it. Tr. 19.

tions, and thus we look to the subject matter of the contract. Marubeni-Iida, Inc. v. Nippon Yusen Kaisha, 207 F.Supp. 418, 419 (S.D.N.Y.1962). "[I]t is as much the duty of the shipowner to load and discharge the cargo as it is to carry it between the loading and discharging ports." Munson S.S. Line v. Glasgow Nav. Co., 235 F. 64, 67 (2d Cir. 1916). In The Seguranca, 58 F. 908 (S.D.N.Y. 1893) several persons were employed to watch the ship's cargo, some of which was on the pier and some on board the vessel. In reasoning that such employment could be characterized as a maritime contract, the Court said (page 909):

> The personal services of watchmen or stevedores * * * are necessary to enable the ship to discharge her maritime duty * * *; they are rendered in the course of the voyage; since the voyage is not ended as regards the goods, until they are delivered, or ready for delivery.

Compare The Fortuna, 206 F. 573 (W.D. Wash.1913); The Sirius, 65 F. 226 (N.D. Calif.1895).

■■ Such contracts of work and labor contain an implied warranty that the work will be done in a skilled and workmanlike manner, Dog River Boat Service, Inc. v. The Frances D, 192 F. Supp. 759, 761; 17A C.J.S., Contracts § 329; 4 Williston, Contracts § 1014 (revised ed. 1936), and the fact that the agreement is oral is immaterial. Booth Steamship Co. v. Meier & Oelhaf Co., 262 F.2d 310, 313 (2d Cir. 1958).

Union Marine contends, in substance, that McRoberts breached its warranty of workmanlike service in failing to have "kept the barrels under constant surveillance until they were safely stored in the pier * * * 'safe room,' as they had agreed to do." Trial Memorandum, p. 35. In this connection Union Marine argues that Cusimano, McRoberts' no. 2 hatch guard, should have notified the pier in some manner that the barrels were about to be discharged.

■ Assuming Union Marine has standing to sue for breach thereof,[8] we find that under the terms of the contract McRoberts did not agree and was not expressly required to maintain constant surveillance of each individual piece of special cargo, and failure to do so is not a breach of the implied warranty of workmanlike service. It is not an insurer. Further, its guards on the pier did not have actual notice of the casings. Moreover, they were not put on notice by virtue of the list.

■ The law compels McRoberts to exercise its best efforts in maximizing the security of the cargo. Whether it had notice or not, breach of warranty under these circumstances is predicated on the normal tort standard of negligence. The principle of liability without fault as an incident to the implied warranty of workmanlike service found in such cases as, e. g., Italia Societa per Azioni di Navigazone v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); Booth Steamship Co. v. Meier & Oelhaf Co., supra, is inapplicable here.

Those cases involved successful indemnity claims brought by shipowner against the stevedore or supplier who, while not negligent, had furnished defective equipment. On the direct claim, recovery had been had against the shipowner on the basis of unseaworthiness. The rationale applied is that since shipowner is liable

---

**8.** "Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must at least show that it was intended for his direct benefit." German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230, 33 S.Ct. 32, 57 A.L.R. 195 (1912). Such intent is lacking here, and Union Marine is merely an incidental beneficiary of the Export-McRoberts agreement. Robins

Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927); 2 Williston, Contracts §§ 401– 402 (3d ed. 1959); 17 Am.Jur.2d, Contracts §§ 304–307 (1964). However, for authority permitting suit for breach of the warranty of workmanlike service wherein plaintiff was not a true third-party beneficiary, see Luigi Serra, Inc. v. S.S. Francesco C., note 9, infra.

regardless of his absence of negligence, it is not "unfair or unwise to require the stevedore to indemnify the shipowner for damages sustained as a result of, injury-producing defective equipment supplied by a stevedore \* \* \*." Italia Societa per Azioni di Navigazone v. Oregon Stevedoring Co., supra at 324, 84 S.Ct. at 754.

Thus, *Italia Societa* may be distinguished from the instant case on two grounds. First, with regard to McRoberts, Union Marine has a non-indemnity claim,[9] (although the opposite is true for Export). Second, unlike the claim for unseaworthiness in *Italia Societa,* the carrier under COGSA would not be liable to Union Marine if it could prove its lack of negligence.[10] American Tobacco Co. v. The Katingo Hadjipatera, 81 F.Supp. 438, 445 (S.D.N.Y.1948), modified on other grounds, 194 F.2d 449 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952). There is no reason to hold McRoberts to a higher undertaking than the carrier's. Cf. *Medomsley Steam Shipping Co. v. Elizabeth River Terminals, Inc.,* 214 F.Supp. 32 (E.D.Va.1962).

We find the record barren of any proof of specific negligent acts or omissions attributable to McRoberts and connected with the disappearance of the shipment. "There is no rule requiring the testimony of eye witnesses, or requiring a defendant voluntarily to testify because the plaintiff cannot otherwise ascertain the facts, or requiring a defendant to prove affirmatively that he was not negligent." Seavey, Res Ipsa Loquitur: Tabula in Naufragio, 63 Harv.L.Rev. 643, 645 (1950). The attendant circumstances are not such that we could reasonably draw an inference of negligence or causation from the mere loss of the cargo.

McRoberts was not negligent in failing to establish a liaison between the ship and the pier. The necessity therefor would seem obviated by the special cargo list. We are not told how the liaison should be accomplished, or why it would be more efficacious than present security means so as to warrant change. On that score, Buckridge testified that in his sixteen to eighteen years of experience there was never any liaison. Union Marine asserts, though, citing Petition of Moore-McCormack Lines, 164 F.Supp. 198 (S.D.N.Y.1958), that what is customarily done is not the sole standard of proper care, and the facts here require imposition of a more detailed undertaking.

In answer to a similar bare assertion made in Kuberski v. New York Central Ry., 359 F.2d 90 (2d Cir. 1966) the Court said:

Of course, industry practice is not always the measure of proper diligence. In some cases "a whole calling may have unduly lagged in the adoption of new and available devices." The T. J. Hooper, 60 F.2d 737, 740 (2d Cir. 1932). In such cases courts have properly felt free to hold that higher standards are required. But to invoke this line of cases there should first be introduced some evidence that the general practice of the industry is not a reasonably prudent practice. The plaintiff made no attempt to introduce such evidence.

9. In Luigi Serra, Inc. v. S.S. Francesco C., 1965 A.M.C. 2029 (S.D.N.Y.) the Court allowed the cargo consignee's direct claim against the stevedore and carpenter based on breach of the warranty of workmanlike service. Conclusion of Law, 13. There was no attempt, however, to hold defendants to a standard approaching absolute liability, since they also were found to be "negligent."

10. See, generally, Gilmore & Black, The Law of Admiralty § 3–37 (1957) with respect to burden of proof under COGSA. Union Marine's burden of proof is not shifted vis-a-vis McRoberts as it is against Export. On the other hand, the $500 package limitation in the Act, relied on by Export, does not inure to McRoberts' benefit. Robert C. Herd & Co. Inc., v. Krawill Mach. Corp., 359 U.S. 297, 79 S.Ct., 766, 3 L.Ed.2d 820 (1959).

## THE TORT CLAIM

Union Marine claims McRoberts as agent for the carrier is liable to plaintiff for its own negligence. Post-Trial Memorandum, p. 9. While it is a generally recognized principle that an agent is liable to third persons for his own misfeasance, the controlling standard of care is no different than that which we applied to the warranty claim.[11] Accordingly, since there is no proof of negligence, we find the tort claim, founded upon the same factual allegations, without merit.

### Bailment

Union Marine seeks to place the burden of explaining the loss on McRoberts. It is asserted that "custody of the barrels in the hands of McRoberts, began with the presence of its guard, Mr. Cusimano in the hold. * * * Once having assumed custody of the barrels, the burden is on McRoberts to explain their disappearance. * * *" Trial Memorandum, p. 34. Certainly, the burden of producing evidence to avoid an unfavorable inference would be cast on McRoberts were it deemed a bailee. Commercial Molasses Corp. v. New York Barge Corp., 314 U.S. 104, 111, 62 S.Ct. 156, 86 L.Ed. 89 (1941). The rule finds its justification in the degree of control normally exercised by the bailee on the theory that nothing could have happened to the property if due care were used. "This is but a particular application of the doctrine of res ipsa loquitur * *." Id., at 113, 62 S.Ct. at 162. See Seavey, Res Ipsa Loquitur, op. cit. supra at 646–47.

There is no claim here, nor could there be with justification, that the casings were received by McRoberts at the "safe room" or "crib" on the pier. We are thus left with the question whether Cusimano, Hinte or other McRoberts guards (not in the safe room) constituted bailees. We find no proof of any delivery and knowledgeable acceptance which would be the basis for a bailment relationship. Requisite possession and control is thus absent from the facts adduced. Cerreta v. Kinney Corp., 50 N.J. Super. 514, 142 A.2d 917 (N.J.1950); Marsh v. American Locker Co., 7 N.J. Super. 81, 72 A.2d 343, 19 A.L.R.2d 326 (N.J.1950), aff'd, 6 N.J. 81, 77 A.2d 315; J. L. Querner Truck Lines v. Safeway Truck Lines, 65 N.J. 554, 168 A.2d 216 (N.J.1961); 8 C.J.S., Bailments § 15; 8 Am.Jur.2d, Bailments §§ 54–59, 61.

### Disposition

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law, required by Rule 52, F.R. Civ.P.

Based upon a quantitative and qualitative review of the entire record and the reasonable and natural inferences to be drawn therefrom, Union Marine has failed to prove its claim against McRoberts by a preponderance of the credible

11. In determining whether McRoberts' allegedly negligent conduct is cognizable as a maritime tort, we must determine whether it occurred on navigable waters. "The tort is deemed to occur, not where the wrongful act or omission has its inception, but where the impact of the act or omission produces such injuries as to give rise to a cause of action. * * *" David Crystal Inc. v. Cunard Steam-Ship Co., note 1, supra 223 F.Supp. at 290. In concluding that the alleged conduct, the situs of which is a pier in New Jersey, does not constitute a maritime tort we are, of course, not concerned with its merits or sufficiency. Cf., Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Applying applicable New York conflicts of law principles, since we are sitting in diversity, we find New Jersey law to be controlling. Babcock v. Jackson, 12 N.Y. 2d 473, 240 N.Y.S.2d 743, 191 N.E. 2d 279, 95 A.L.R.2d 1 (1963). Under New Jersey law, the requisite standard of reasonable care for work undertaken appears no different than the standard we have articulated with respect to the implied warranty claim. Heuser v. Reilly, 128 N.J.L. 533, 27 A.2d 4 (Sup. Ct.N.J.1942), aff'd, 129 N.J.L. 388, 30 A.2d 27 (1943). See Franklin v. May Dep't Store, 25 F.Supp. 735 (E.D.Mo. 1938); Landreth v. Phillips Petroleum, 74 F.Supp. 801 (W.D.Mo.1947); Restatement 2d, Agency §§ 351, 354–55.

evidence. Export has similarly failed to prove its cross-claim.

The complaint and cross-claim are dismissed. Judgment shall be entered for defendant.

This shall be considered an order; settlement thereof is unnecessary.

So ordered.