42 N.Y.2d 482 (1977)
Milau Associates, Inc., Plaintiff,
v.
North Avenue Development Corp., Defendant. (Action No. 1.)
Baum Textile Mill Co., Inc., et al., Appellants,
v.
Milau Associates, Incorporated, et al., Respondents. (Action No. 2.)
Court of Appeals of the State of New York.
Argued September 8, 1977.
Decided October 11, 1977.
Milton B. Pfeffer for appellants.
Ralph S. Joseph, Harry A. Fox and Leo J. Gutterman for Milau Associates Incorporated, respondent.
Roger P. McTiernan for Higgins Fire Protection, Inc., respondent.
Chief Judge BREITEL and Judges JASEN, GABRIELLI, JONES, FUCHSBERG and COOKE concur.
*484 WACHTLER, J.
A massive burst in an underground section of pipe, connecting a sprinkler system to the city water line, caused substantial water damage to bolts of textiles stored in a warehouse. The plaintiffs who were commercial tenants of the building sought recovery against both Milau Associates, the general contractor which built the warehouse, and Higgins Fire Protection, Inc., the subcontractor which designed and installed the sprinkler system. The suit was brought on the alternative theories of negligence and breach of implied warranty of fitness for a particular purpose.
Evidence adduced at the trial indicated that the break followed the occurrence of a phenomenon known as a "water hammer"  a sudden and unpredictable interruption in the flow from the city water main, followed by a back-surge and build-up of extreme internal pressure when the flow was again released. According to the plaintiffs' experts, this "hoop tension" caused a crack to develop at the root of a V-shaped notch discovered toward the end of the conduit; the fracture traveled along the length of the vulnerable section of pipe with a tearing action and the torrential result.
The "stress-raising" notch was alleged to have been produced by a dull tooth on the hydraulic squeeze cutter used by Higgins to cut sections of the commercially marketed pipe furnished by the subcontractor as specified in the work contract with Milau. Although the 400-foot-long connection had been carefully tested and had functioned properly in conjunction with the remainder of the system inside the building, only a few months in operation had caused enough rusting at the base of the notch, plaintiffs contended, to affect the integrity of the entire system. The defendants produced offsetting expert opinion that the pipe itself was neither defective as manufactured nor improperly installed.
*485 The Trial Judge, having denied plaintiffs' request to charge that the contractors had impliedly warranted the fractured pipe to be fit for its intended purpose, submitted the case to the jury on the sole question of negligent installation. The jury returned a verdict in favor of the defendants, finding neither want of due care by Higgins nor negligent supervision by Milau.
The textile companies contest the trial court's restrictive rulings on the law of warranty. They assert that the V-shaped notch found in the ruptured section of pipe is adequate proof that this crucial component of the sprinkler system supplied by Higgins was defective. It is their contention that the jury would have been justified in finding a defect in the "goods" furnished under the hybrid sales-services contract without necessarily finding negligence on the part of either defendant. The plaintiffs argue that this defect made the pipe unfit for its intended purpose and that they were entitled to have the jury decide whether there was a breach of an implied warranty under section 2-315 of the Uniform Commercial Code or by application of common-law warranty principles.
The majority at the Appellate Division found the record to be "devoid of any evidence that the pipe installed by Higgins was unfit for its intended purpose" (56 AD2d 587, 588), and concluded that neither the code nor the case law could be invoked to grant the extension of warranty protection sought by the plaintiffs. While we agree with this result, we have some difficulty with that court's caveat that, "in a proper case, the implied warranty provisions of the Uniform Commercial Code might apply to the `sale of goods' aspect of a hybrid sales-services contract (see Schenectady Steel Co. v Trimpoli Gen. Constr. Co., 43 AD2d 234 [concurring opn by Greenblott, J.], affd 34 N.Y.2d 939)." (56 AD2d 587-588.)
The sales-services dichotomy has been recognized and developed from the days of the law merchant.[*] In a more contemporary formulation, this court in Perlmutter v Beth David Hosp. (308 N.Y. 100, 104) *486 held that, "when service predominates, and transfer of personal property is but an incidental feature of the transaction", the exacting warranty standards for imposing liability without proof of fault will not be imported from the law of sales to cast purveyors of medical services in damages. In that case we held that this prohibition could not be circumvented by conceptually severing the sale of goods aspects of the transaction from the overriding service component so that a hospital's act of supplying and even separately charging for impure blood plasma could not in logic or common sense be separated from a physician's contribution in administering the plasma during the course of treatment. Viewed in its entirety, we held in Perlmutter that the transaction could not be characterized in part or in its underlying nature as one for the sale of goods, for Mrs. Perlmutter had checked into the hospital to restore her health, not to purchase blood.
The fact that in Perlmutter our "service predominates" analysis led to a conclusion of law which was also supported by policy considerations peculiar to the impure blood cases does not strip its analytic approach of vitality. The court made no attempt to mask the fact that reallocating the risk of loss by imposing warranty liability on no greater proof than the adverse result itself would place untoward economic and health-care burdens on hospitals and patients alike. However, the court's sensitivity to these policy considerations, rather than restrict the scope of its holding, should suggest the need to assess all hybrid transactions along the sales-services continuum both legally and pragmatically.
As suggested in Perlmutter, those who hire experts for the predominant purpose of rendering services, relying on their special skills, cannot expect infallibility. Reasonable expectations, not perfect results in the face of any and all contingencies, will be ensured under a traditional negligence standard of conduct. In other words, unless the parties have contractually bound themselves to a higher standard of performance, reasonable care and competence owed generally by practitioners in the particular trade or profession defines the limits of an injured party's justifiable demands (e.g., Aegis Prods. v Arriflex Corp. of Amer., 25 AD2d 639 [recognizing that in cases where "the service is performed negligently, the cause of action accruing is for that negligence", and "if it constitutes a breach of contract, the action is for that breach"]).
*487 The parties to the contract underlying this action were perfectly free at the outset, although not after the fact, to adopt a higher standard of care to govern the contractors' performance. Indeed, under a subcontract in which Higgins undertook to design and put together a sprinkler system tailored to the needs of the commercial tenants, the subcontractor was obligated to "Furnish and install [a] wet pipe sprinkler system all in accordance with the requirements of the New York Fire Insurance Rating Organization, including * * * One (1) 8" City water connection from pit at property line to inside of factory building". Additionally, by affixing its corporate signature to the standard form construction subcontract, the fire protection specialist "expressly warranted" that "all * * * materials and equipment [which it] furnished and incorporated [would] be new" and that "all Work under this Subcontract shall be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not conforming to these standards may be considered defective" (emphasis added).
Section 2-313 of the Uniform Commercial Code requires that a "seller's" affirmation of fact to a "buyer" be made as part of the basis of the bargain, that is, the contract for the sale of goods. The express warranty section would therefore be no more applicable to a service contract than the code's implied warranty provisions. Of course, where the party rendering services can be shown to have expressly bound itself to the accomplishment of a particular result, the courts will enforce that promise (e.g., Robins v Finestone, 308 N.Y. 543; Frankel v Wolper, 181 App Div 485, affd 228 N.Y. 582).
Here the textile company plaintiffs had the opportunity to plead and test the construction of the written warranty provided in the work subcontract at the trial level. They opted instead to prove fault, and if that failed, to seek enforcement of a warranty imposed by law for the sale of goods unfit for their intended purpose. They were unable to convince a jury that Higgins had performed negligently. And they failed as well to demonstrate that the work subcontract was anything other than precisely what the parties had understood it to be: an agreement outlining the materials to be employed and the performance obligations to be assumed by a construction specialist hired to install a sprinkler system. Both the subcontract and the agreement between Milau and the owner were on their face and at heart no more than a series of performance *488 undertakings, plans, schedules and specifications for the incorporation of the specialized system during the erection of a building  a predominantly labor-intensive endeavor. In the final analysis, the parties contemplated the workmanlike performance of a construction service. The fact that something went wrong less than six months after that service was performed does not change the underlying nature of the agreement governing its performance.
Given the predominantly service-oriented character of the transaction, neither the code nor the common law of this State can be read to imply an undertaking to guard against economic loss stemming from the no negligent performance by a construction firm which has not contractually bound itself to provide perfect results (see Schenectady Steel Co. v Trimpoli Gen. Constr. Co., 43 AD2d 234, 238-239; id., pp 239-240 [COOKE, J., concurring in part]; Ben Constr. Corp. v Ventre, 23 AD2d 44; see, also, North Amer. Leisure Corp. v A & B Duplicators, Ltd., 468 F.2d 695; 1 Anderson, Uniform Commercial Code [2d ed], §§ 2-102:5, 2-105:10; 1955 Report of NY Law Rev Comm, p 361). In fact, where courts in other jurisdictions have purported to apply an implied warranty of fitness to transactions which in essence contemplated the rendition of services, what was actually imposed was no more than a "warranty" that the performer would not act negligently (e.g., Bloomsburg Mills v Sordoni Constr. Co., 401 Pa 358), or a warranty of workmanlike performance imposing only the degree of care and skill that a reasonably prudent, skilled and qualified person would have exercised under the circumstances (e.g., Union Mar. & Gen. Ins. Co. v American Export Lines, 274 F Supp 123; Pepsi Cola Bottling Co. v Superior Burner Serv. Co., 427 P2d 833 [Alaska]), or an implied warranty of competence and ability ordinarily possessed by those in the profession (Wolfe v Virusky, 306 F Supp 519). (See, generally, Greenfield, Consumer Protection in Service Transactions  Implied Warranties and Strict Liability in Tort, 1974 Utah L Rev 661, 668-673.) The performance of Higgins and Milau was tested under precisely this standard and found free from any actionable departure.
To be sure, particularly in cases involving personal injury, the absence of an enforceable contractual relationship for the technical sale of goods will not necessarily result in the foreclosure of all remedies, at least where the policies favoring the imposition of strict tort liability for the marketing of *489 defective products are present (see, e.g., Victorson v Boch Laundry Mach. Co., 37 N.Y.2d 395; Velez v Craine & Clark Lbr. Corp., 33 N.Y.2d 117) or where manufacturing misjudgments create an unreasonably dangerous condition (see Micallef v Miehle, Co., 39 N.Y.2d 376). However, in the products liability cases, "[r]ather than arising out of the `will or intention of the parties', the liability imposed on the manufacturer * * * is predicated largely on considerations of sound social policy" (Victorson v Boch Laundry Mach. Co., supra, p 401, quoting Codling v Paglia, 32 N.Y.2d 330, 340-341), including consumer reliance, marketing responsibility and the reasonableness of imposing loss redistribution. Yet the language and policies of the tort-based cases "should not be understood as in any way referring to the liability of a manufacturer [or tradesman] under familiar but different doctrines of the law of contracts for injuries sustained by a customer or other person with whom or for whose benefit the manufacturer previously has made a warranty or other agreement, express or implied" (Victorson v Boch Laundry Mach. Co., supra, p 400).
The appellants here, however, had at no time in the course of litigation sought to invoke these doctrines to redress their no less real but somehow less impelling economic loss. Additionally, to a much greater extent than professionals and tradesmen in the services arena where standards are usually set contractually, sellers of goods typically encourage mass public reliance on their products' fitness and safety through advertising, packaging and other promotional devices. This phenomenon is reflected in the fact that the code's warranties attaching to sales of goods are underpinned by an assumption of some form of reasonable reliance by the unleveraged buyer.
No such situation presents itself here and we can find no reasonable basis in policy or in law for reading what would amount to a warranty of perfect results into the contractual relationships defined by the parties to this action.
Accordingly, the order of the Appellate Division should be affirmed.
Order affirmed, with costs.
NOTES
[*] From its inception, the "English rule" served as a basis for applying the commercial law of sales whenever a transaction resulted in a transfer of chattels. Applying this formulation in Lee v Griffin (1 B & S 272; 121 Eng Rep 716 [KB, 1861]), Justice BLACKBURN held that a contract to manufacture and fit a set of false teeth was subject to sales remedies. Courts in this country, however, generally followed the "labor rule", under which the law of sales would not be applied if the contract required a workman "to put materials together and construct an article for the employer" (Mixer v Howarth, 38 Mass [21 Pick] 205, 207 [1838]).